2008 VT 12

## Maureen Chase v. Brian J. Bowen

[945 A.2d 901]

No. 06-393

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 8, 2008

*Michelle Kainen* of *Michael Kainen Attorney at Law PC*, White River Junction, for Plaintiff-Appellant.

*Brian J. Bowen*, Pro Se, Thetford Center, Defendant-Appellee.

*Alexander W. Banks* and *Jonah Adley*, Legal Intern, *South Royalton Legal Clinic*, South Royalton, for Minor Children.

¶ 1. **Burgess, J.** Mother appeals the family court's order awarding father sole legal rights and responsibilities and her sole physical rights to their two boys, and granting father unsupervised contact with the boys every other week. Mother contends that the court erred in: (1) admitting father's expert testimony on investigative techniques and giving it greater weight than the testimony of the state investigator; (2) allowing father to move for sole custody halfway through the hearing without advance notice; (3) failing to order father to undergo a psychosexual evaluation; (4) denying mother's request to call father's former lawyer as a witness; (5) failing to adequately protect the children from the risk presented by father; (6) relying on unsupported findings in its best-interest analysis; and (7) awarding shared custody in violation of the statute. The boys' attorney joins in mother's appeal on the issues of notice and evaluation, and also claims error in what is described as the family court's failure to recognize and remedy the risk to the children. We affirm.

¶ 2. The court found the following facts. The parties were married in 1996. At that time, mother had a nine-year-old daughter from a previous marriage. Father assumed an active parental role in stepdaughter's life from the beginning. The parties had two boys of their own during their marriage, born in 1997 and 1999. Following the parties' separation in 2000, both parents shared parenting and remained active in all of the children's lives. The final divorce order, issued in February 2002, granted the parties shared legal and physical rights and responsibilities to the two boys. The order granted father physical contact three days a week and mother four days a week. Following the divorce, all three children spent time in both households, and the parties maintained good relations and cooperated in making joint decisions.

¶ 3. In June 2004, stepdaughter, who was then sixteen, disclosed to mother's then-boyfriend that her stepfather had been molesting

her for a number of years. She alleged that some of the abuse occurred while her younger brothers were asleep in the same room. After mother learned of the allegations, she contacted a lawyer, the Department for Children and Families (DCF) and the state police. DCF conducted an investigation in conjunction with the police and, based on stepdaughter's allegations, interviews of people at stepdaughter's school and police interviews of father, DCF "substantiated" the allegations as true.[1]

¶ 4. DCF advised mother to take protective measures on behalf of the boys. Mother filed for a relief-from-abuse order, and moved to modify parental rights and responsibilities. Father did not see the boys for about a month and then had limited supervised contact with them. Father filed a motion to amend the temporary contact schedule so he could spend more time with his sons.

¶ 5. The court held a hearing on March 17, 2006 to consider temporarily altering the parent-child contact schedule pending a final hearing. At the temporary hearing and thereafter, father represented himself and testified on his own behalf. Mother was represented and also testified. The boys were represented by their own attorney. All parties stipulated that the evidence offered at the temporary hearing would become part of the record for the final hearing. Among other witnesses, the court heard testimony from the DCF investigator. The investigator testified that DCF had "substantiated" the abuse, following its investigation. The investigator also recommended that father undergo a psychosexual evaluation to ascertain the risk he posed to the boys. The court granted father parent-child contact every other weekend from Friday afternoon until Monday morning, and on the intervening weekend from Friday afternoon until Saturday morning or early evening, depending on mother's work schedule. The order required supervision from 7 p.m. until 7 a.m. The court also granted father unsupervised contact with the boys before and after school.

¶ 6. On August 1, 2006, the court held a final hearing on mother's motion to modify parental rights and responsibilities. At the beginning of the hearing, father stated he had no outstanding custody motion, and all parties agreed that the only matter before the court was mother's motion to modify. In addition, the parties

---

[1] Criminal charges brought against father based on the allegations resulted in two hung juries. These charges were still pending at the time of the final hearing to modify parental rights.

stipulated that the threshold requirement for a change of circumstances had been met based upon the allegations of abuse, the resulting family disruption and the inability of the parties to communicate.

¶ 7. Stepdaughter testified that, starting when she was eleven, father would sexually molest her while she slept, and later when she showered, to the point of digital penetration and attempted sexual intercourse. Such incidents occurred, explained stepdaughter, before and after her parents separated, and at times when her two brothers were either asleep in the same room or in another room in the same house. Stepdaughter testified that she told a friend, but that she was too scared to tell mother when the abuse was happening. Stepdaughter acknowledged that the night before she disclosed the abuse she was out late without permission and her father had to pick her up.

¶ 8. Father testified, denying that he ever sexually abused stepdaughter and proffering several reasons why she would lie about the abuse. Father posited that she concocted the allegations to avoid discipline because he was going to tell her mother that she was out late and was "stoned." Father also thought that stepdaughter resented his discipline, and wanted to cut off contact with him. Father accused mother of encouraging stepdaughter to lie, on a theory that mother wanted to obtain child support and also benefited from the charges by receiving the assistance of a free attorney in family court.

¶ 9. At the close of the hearing, both mother and the boys' attorney requested that father undergo a psychosexual evaluation. Pertaining to this request, we note that stepdaughter's and father's testimony was the only evidence of whether stepfather sexually abused stepdaughter when her brothers were sleeping in the same room or house. Presumably in support of the abuse allegation, mother introduced the DCF investigator's testimony crediting stepdaughter's allegations of the abuse, but the relevance of such substantiation remained unexplained. DCF's belief that stepdaughter had been abused was not evidence of the abuse and was no more probative than the finding of probable cause presumably underlying the parallel criminal proceeding. Mother's interest in having the court order father to undergo a psychosexual evaluation presumably reflected the DCF investigator's testimony that, based on her belief of the accusation, father should be assessed for risk to the boys.

¶ 10. The court issued oral findings from the bench, reviewing the statutory factors and conducting a best-interests analysis. See 15 V.S.A. § 665(b) (listing the statutory best-interests factors). The court found the parties equally qualified under six factors, insofar as both parents had a loving relationship with the boys, were actively involved in their lives, were able to foster a positive relationship with the other parent, acted as primary care-givers, and were connected to other family members important to the children. See *id.* § 665(b)(1), (b)(4)-(8). The court also found both parents equally capable of providing for the children's needs and a safe environment, see *id.* § 665(b)(2), while recognizing that safety with father would be compromised if the allegations against him were true.

¶ 11. The court favored father over mother regarding "the ability and disposition of each parent to meet the child's present and future developmental needs." See *id.* § 665(b)(3). On this factor, the court found father more actively involved in the boys' development, particularly through his interactions with schools, teachers and physical activities. Further, the court found that father's decisions tended to be slightly more child-centered than mother's and that father concentrated on providing consistency and exposing the boys to positive role models. The court noted that mother was also involved, but that father took a greater leadership role in these matters and was more committed to holding the boys accountable for their behavior.

¶ 12. On the final factor, "evidence of abuse . . . and the impact of the abuse on the child and on the relationship between the child and the abusing parent," *id.* § 665(b)(9), the court's resolution was mixed. Acknowledging that stepdaughter's abuse allegation was central to the case, the court found that the DCF investigation was not thorough or reliably done, and concluded

> that the allegations have neither been proved nor disproved, that [stepdaughter's] testimony is very credible . . . . [Father's] testimony is also credible and the Court having considered all of the evidence does not find that the burden of proof has been met to conclude that the things that have been described happened as they have been described.

Even though not persuaded that the abuse occurred, the court nevertheless concluded that "the evidence shows that there may

be a risk" based on the unresolved possibility that the abuse could have occurred as alleged. Inconclusively, the court considered that if there was a risk, it was defined by stepdaughter's testimony and limited to the possibility that father could have inappropriate sexual contact with underage females while his boys are present in the home.

¶ 13. Based on these findings, the court granted mother sole physical parental rights, and father sole legal parental rights. The court explained that mother would make final decisions regarding "arrangements for daily activities during the summer and school vacation subject to parent/child contact," and father would "make all final decisions concerning education, medical treatment, disciplinary matters involving third parties and other matters of legal responsibility." For parent-child contact, the court granted father unsupervised contact every other week. In response to the risk presented by the unresolved possibility that father abused stepdaughter as alleged, the court imposed the restriction that "no females under the age of 18 shall be present in his home unless accompanied by a parent and in no event shall a female under 18 spend the night." The court denied the request for father to undergo a psychosexual exam. Mother appealed, and the boys' attorney joined in the appeal.[2]

## I. Father's Expert Testimony

 ¶ 14. On appeal, mother asserts that the court erred in allowing father, a former security guard, to testify as an expert about deficiencies in DCF's investigation. Mother contends this error was prejudicial in that the court relied on father's testimony in its findings. We conclude that any error was irrelevant because evidence of DCF's substantiation could not prove the allegations before the court. Mother's apparent reliance on DCF's substantiation of the abuse is misplaced. The DCF investigation informed only that agency's finding that the allegation was substantiated.[3]

---

[2] On appeal, the parties have filed various motions to strike parts of the opposing side's appellate brief because the information was not part of the record. See V.R.A.P. 10(a). Because we need not consider any of the challenged materials or references to reach our decision, we dismiss these motions as moot.

[3] We assume that DCF investigated the matter pursuant to its charter to respond to reports of child abuse, see 33 V.S.A. § 4915, but such a response is not necessarily relevant to the family court's assessment of parental rights and responsibilities.

DCF's substantiation, and whatever investigative effort it represented, constituted no actual proof of any issue to be decided by the family court.

■ ¶ 15. We also reject mother's claim that the court erred in giving father's testimony greater weight than that of the DCF investigator. Again, mother misperceives the significance of the DCF finding. The investigator's testimony about substantiating stepdaughter's allegations did nothing more than confirm that the investigator believed the allegations. The investigator's testimony presented no facts, independent of the accusation itself, to prove or corroborate the allegation. That the DCF investigator believed stepdaughter, and not father, was ultimately irrelevant since it had no tendency to make more or less probable the existence of any fact consequential to the court's determination of the best interests of the children. See V.R.E. 401 (defining relevant evidence). Even if the DCF investigator's opinion merited any weight, it remained entirely within the domain of the trial court to give more credit to father's testimony. See *Omega Optical, Inc. v. Chroma Tech. Corp.*, 174 Vt. 10, 20-21, 800 A.2d 1064, 1071 (2002) (noting that "[d]eterminations of credibility are solely the province of the factfinder" and that this Court, on appeal, will not reweigh the evidence or make findings of credibility de novo); *Cabot v. Cabot*, 166 Vt. 485, 497, 697 A.2d 644, 652 (1997) (observing that, "[a]s the trier of fact, it was the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence").

## II. Lack of Notice Regarding Father's Request for Custody

¶ 16. Mother contends that the court erred in granting father sole legal custody when father did not previously submit a motion for sole custody to the family court. Mother claims that she was prejudiced because if she had notice that father was seeking sole custody, she would have used her time during the hearing to elicit testimony regarding her ability to parent the boys. We conclude that there was no error.

¶ 17. At the beginning of the final hearing, all parties agreed that the only motion before the court was mother's motion to modify. More than halfway through the first day of the final hearing, father began to question mother about her parenting style and decisions. Mother's and the boys' attorneys objected to

the relevance and scope of the question. The boys' attorney reiterated that the sole purpose of the hearing was to entertain mother's motion for modification and that if father was also seeking custody he should file an appropriate motion. Father did not move for custody, but the court allowed the questions, reasoning that since mother was seeking to modify the existing shared custody arrangement, the court had to construct a new custody order based on the children's best interests and thus mother's parenting capacity was relevant.

¶ 18. At the close of mother's case, the court asked the parties to clarify what type of arrangement they were seeking. Mother requested sole legal and physical custody with several days of contact each week for father. Father also requested sole legal and physical custody with alternating weeks of parental contact. Neither mother nor the boys' attorney objected to the timeliness or lack of notice of this latter request for custody by father.

¶ 19. On appeal, mother contends that had she been on notice of father's motion for custody, she could have presented more evidence on her parenting capabilities. Having made no such objection to the trial court, however, this argument was not adequately preserved below. See *Adams v. Adams*, 2005 VT 4, ¶ 15, 177 Vt. 448, 869 A.2d 124 (holding that failure to raise an issue in the trial court precludes raising that issue on appeal). If mother made her surprise or needs known to the trial court, an appropriate remedy could have been fashioned.

¶ 20. Moreover, mother's contention that she was prejudiced is unfounded because her own motion to modify put the custody and contact order, as well as her parenting ability, in issue. Once the threshold for changed circumstances is established, to proceed with a motion to modify the court must determine if a change in parental rights and responsibilities is in the best interests of the children. 15 V.S.A. § 668; *Maurer v. Maurer*, 2005 VT 26, ¶ 10, 178 Vt. 489, 872 A.2d 326 (mem.). This best-interests analysis requires the family court to "consider the statutory factors set forth in 15 V.S.A. § 665(b)." *Maurer*, 2005 VT 26, ¶ 10. These factors direct the court to examine, among other things, the comparative parenting abilities of the parties. 15 V.S.A. § 665(b)(1)-(3), (5), (8).

¶ 21. Accordingly, mother's parenting ability and relationship to the children were necessarily relevant to the family court's ruling on her own motion to modify, regardless of whether father

properly requested sole custody. The parties had joint custody prior to mother's motion for modification. Both parties agreed that they could no longer continue their shared parenting arrangement due to the change of circumstance arising from stepdaughter's allegation. In crafting a new custody order, the court had to consider each party's parenting ability. *Id.* Thus, mother was on notice that to sustain her motion she had to present evidence relevant to each of the factors. As we have previously explained, a parent requesting custody cannot claim the benefit of a statutory factor by demonstrating that the other parent's performance is inadequate; rather, the moving parent must present affirmative evidence regarding her relationship with the children. *Johnson v. Johnson*, 163 Vt. 491, 494, 659 A.2d 1149, 1151 (1995). Thus, mother's claim of prejudice must fail. See *Lyddy v. Lyddy*, 173 Vt. 493, 494, 787 A.2d 506, 510 (2001) (mem.) (concluding that the father was not prejudiced by lack of notice of the mother's cross-claim because the father had already raised the same issues).[4]

### III. Psychosexual Evaluation

¶ 22. Both mother and the boys' attorney argue that the family court erred in failing to order father to undergo a psychosexual examination. In her testimony, the DCF investigator recommended the exam to assess whether unsupervised contact with father would be appropriate. At the end of the temporary hearing, mother requested that the court order father to submit to a psychosexual exam, but the court declined to order an exam at that time. At the close of evidence in the final hearing, mother again requested, as did the boys' attorney, that father submit to a psychosexual exam. In its findings, the court explained,

> we do not have the authority to simply order that such things be done, however we recommend in the strongest

---

[4] On a slightly different tack, the boys' attorney argues on appeal that modification of parental rights must be made by written motion and served as required by Rule for Family Proceedings 4(j)(2). In support, the boys' attorney cites *Nichols v. Nichols* for the proposition that the court abused its discretion in granting father sole custody without such formality. 133 Vt. 370, 371, 340 A.2d 73, 74 (1975) (holding that the trial court erred in addressing the plaintiff's request for alimony where no request for alimony was ever made). We need not resolve this question, given our conclusion that mother's own motion to modify required the family court to consider custodial assignment of the children with father, as well as mother, as part of the statutory best-interests analysis.

terms that [father] undergo a psychosexual evaluation for the benefit of the boys. . . . The question of whether or not he represents a risk to the safety and well-being of the children could be partially addressed by engaging in a psychosexual evaluation and could help move toward closure or resolution . . . . it is something that we feel that we do not have the authority to order, but we're strongly recommending it.

¶ 23. Mother apparently understands the court's declaration to be absolute; that is, the family court meant that under no circumstances did it have authority to order an evaluation. If so, mother points out that Rule for Family Proceedings 5 expressly provides to the contrary that "the family court . . . may order a physical or mental evaluation of a party." Thus, asserts mother, the court erred in not recognizing its own authority.

■■■ ¶ 24. We agree that the plain language of Rule 5 permits the family court to order a psychosexual evaluation, but read the authorizing phrase, "*may* order," to leave such orders to the court's discretion. *Id.* (emphasis added). Rule 5 does not authorize the court to issue such orders at its whim or upon mere demand of a litigant, but only in the sound exercise of its discretion. It follows that the court did not err in concluding it had no authority "to *simply* order . . . such things." (Emphasis added.)

¶ 25. We disagree with mother that the court denied the request on its misperceived lack of legal authority to order an evaluation, and we interpret the court's decision as denying the request because there was insufficient evidence to warrant such an exam. This interpretation is supported by the full context of the court's expressions on the matter. The court's characterization of its inability to "simply" order the examination as something that the court "felt" it did not have the authority to do is consistent with discretionary action, rather than suggesting lack of legal authority to even consider such a request. Any ambiguity in this regard is removed by reference to the court's earlier ruling on mother's request for the same evaluation at the temporary hearing: "We have also considered whether or not to order any evaluations . . . *and we have decided not to do so.*" (Emphasis added.) Then, as at the final hearing, the family court did not perceive itself as powerless, but exercised its discretion in declining to order the evaluation.

¶ 26. Accordingly, we review the court's ruling for abuse of discretion, and find none. See *Mansfield v. Mansfield*, 167 Vt. 606, 607, 708 A.2d 579, 581 (1998) (mem.) (explaining that family court has broad discretion in custody matters, including discretion to accept or disregard evaluation reports). While the DCF investigator opined that the exam would be helpful in assessing risk to the boys, her recommendation was premised on her opinion that father had, in fact, sexually abused stepdaughter when the boys were in proximity. No evidence was presented to show how such an evaluation would provide any useful information, given father's denial of any abuse, or how a psychosexual evaluator could, under the circumstances of this case, otherwise reliably assess the risk to the parties' children. In addition, no evidence was introduced to establish any risk to the boys other than stepdaughter's allegation that father molested her when her brothers were in the house or asleep in the same room — a claim not proven to the trial court. The available evidence did not compel a judicial mandate for a psychosexual evaluation. Even if there were grounds to support an evaluation, we defer to the court's ruling if there is a reasonable basis to support it and will not set it aside "because a different result might have been supportable, or because another court might have reached a different conclusion." *In re L.R.R.*, 143 Vt. 560, 562, 469 A.2d 1173, 1175 (1983).

## IV. Father's Attorney-Client Communications

¶ 27. Next, mother contends that the court erred in denying her request to question father's attorney regarding discussions between the attorney and father of a plea agreement in father's criminal case. The court excluded the testimony as protected by attorney-client privilege. Mother argues that father waived the privilege when he testified on direct examination that both of his criminal defense attorneys urged him to accept a plea agreement. We conclude the court did not err.

¶ 28. Father testified on direct examination that, despite his criminal defense lawyers' advice to accept a plea bargain because he had a slim chance of success at trial, he insisted on going to trial to prove his innocence. On cross-examination, father admitted that he offered to plead for a deferred sentence, but denied proposing to terminate his parental rights in return for a plea bargain. On redirect, father testified that he had looked into a plea bargain at one time on the recommendation of his psychiatrist.

¶ 29. Following father's testimony, mother attempted to sub-poena his defense attorney to testify about the terms of the proposed plea agreements. Father objected based on attorney-client privilege. Mother responded that father waived the privilege by voluntarily disclosing the discussion. The court concluded that father waived his privilege concerning the attorney's advice to accept a plea, but had not waived the privilege concerning the content of proposed plea bargains, and that his attorney-client communication in this regard was protected.

¶ 30. We agree with the trial court that father's statements during direct and redirect examination were a limited waiver of confidentiality as to what he was advised to do by his lawyer, and did not extend to the details of the plea offers. In general, a party has a privilege to refuse to disclose confidential communications between himself and his lawyer. V.R.E. 502(b). The privilege may be waived if a party puts communication between himself and his attorney at issue. See *Steinfeld v. Dworkin*, 147 Vt. 341, 343, 515 A.2d 1051, 1052 (1986) (holding that "a party attacking his own attorney's authority to settle impliedly waives the privilege as to the very matter he puts in issue"). Here, however, mother did not seek to challenge the accuracy of the communication described by father on direct, but proffered that she wanted to prove that father proposed to bargain away his parental rights to his children as relevant to his character as a parent and a person. Father did not disclose or raise a question about the particulars of any plea negotiations or proposed plea bargains in his direct or redirect testimony. The court correctly determined that father did not put all of his communications regarding proposed plea agreements at issue so as to waive his attorney-client privilege.

## V. Risk to Children

¶ 31. Both mother and the boys' attorney contend that the prohibition on the presence of young females during father's contact with the boys was unsupported by the evidence and by professional opinion. The boys' counsel complains that the court's order naively assumes a limited risk, while disregarding the DCF investigator's testimony about risk, labeled by counsel as the only competent evidence on that issue. Counsel's argument fails for two reasons. First, whatever risk the DCF investigator perceived was

premised on her belief that father was an untreated child molester, in denial and with unsupervised access to his children. This belief depended entirely on an accusation *not proven* to the family court. Second, the DCF investigator described no risk to the boys other than the patently obvious concern about the parental judgment of a father who would molest his stepdaughter while his other children slept in the same room, an allegation the family court found unsupported by the evidence.

¶ 32. Counsel also suggests that because the court acknowledged a remaining possibility of risk, and the only evidence of risk was the testimony of the DCF investigator, it was error to not fashion the remedy prescribed in that testimony: supervised contact pending a psychosexual evaluation. This argument would have weight had the sexual assault been proven, but it was not. Thus, we must treat the family court's conclusion that there still "may be a risk" to the boys to be somewhat abstract, in the sense that the absence of proof never eliminates the possible existence of a claimed fact. The DCF investigator testified to no risk to the boys other than that she was concerned that father sexually molested stepdaughter while her brothers were asleep in the room. Assuming, as did the family court, that such risk remained possible despite insufficient evidence to prove daughter's allegations, the court's order limiting contact with minor females during the boys' time at father's house[5] was not inconsistent with the investigator's testimony.

¶ 33. In a related argument, mother complains that this unilateral invention by the court to avoid possible risk to the boys unfairly tilted the statutory factor dealing with abuse and its impact on the children, see 15 V.S.A. § 665(b)(9), in father's favor, when mother presented no risk whatsoever. To reiterate, no tangible risk to the boys was proved. To the extent some abstract risk remained that father might engage in sexual misconduct with minor females in proximity to the boys, the court's order limiting contact with minor females addressed this possibility. No other threat to the children was identified at trial, expertly or otherwise. The court's restriction on father's contact with underage females did not tilt this factor in father's favor, as mother suggests;

---

[5] Father does not challenge the family court's order on this point, so we leave it undisturbed without considering whether such protective conditions may be ordered in response to a theoretical, but unproven, risk.

rather, the restriction sought to neutralize the sole, albeit theoretical, risk that the family court found supported by the evidence.

## VI. Findings and Conclusions

¶ 34. Mother contends that the family court relied on unsupported findings in its best-interests analysis. First, mother contends that the family court's finding that father is more involved in the boys' education is erroneous. Mother asserts that father spent more time with the children because he was not working, not because father had a greater interest in the children's lives. Thus, mother contends that the court erred in finding for father on this factor. The court has broad discretion in considering the factors and determining the children's best interests. *Maurer*, 2005 VT 26, ¶ 10. The court's decision on this factor was not limited to the amount of time father spent with the children, but focused on father's demonstrated interest in the boys' education and development. The court's findings are supported by the testimony, and we will not disturb them on appeal.

¶ 35. Second, mother argues that in considering the best interests of the children, the court failed to consider her allegation that father was seeking sole custody to reduce his obligation to pay child support. We find no error because in assessing the best interests of the children, the trial court was not required to consider this allegation, much less accept it as fact. See *Osmanagic v. Osmanagic*, 2005 VT 37, ¶ 9, 178 Vt. 538, 872 A.2d 897 (mem.) (explaining that trial court has discretion to consider factors not contained in § 665(b), but is not required to do so).

¶ 36. Third, mother maintains that the court erred in finding that father never admitted to stepdaughter's allegations of abuse. Mother contends that the court failed to consider father's offer to plead to the criminal charge in exchange for a deferred sentence, and ignored claimed admissions made during his cross-examination of stepdaughter. We are not persuaded. Mother is correct that father referred to himself in the first person while cross-examining stepdaughter about her disclosure of "the things that I had done to you." In context, and absent more development, father's pro se phraseology appears no more an admission than a rhetorical device. The weight given such statements is properly left to the trial court. See *Mullin v. Phelps*, 162 Vt 250, 261, 647

A.2d 714, 720 (1994) ("We reiterate that our role in reviewing findings of fact is not to reweigh evidence or to make findings of credibility de novo."). At trial, the testimony that father considered a plea deal with the State was not admitted as evidence of father's guilt. Mother asserts the plea negotiation as an admission for the first time on appeal, and therefore we do not address it. *Noble v. Kalanges*, 2005 VT 101, ¶ 28 n.5, 179 Vt. 1, 886 A.2d 767. Moreover, even accepting both of these items as evidence of an admission, given father's direct testimony unequivocally denying the allegations, the court's finding that father denied the allegations was not clearly erroneous.

¶ 37. Fourth, mother contends that because the parties stipulated that there was a change in circumstances, the court did not need to find by a preponderance of evidence that father had molested stepdaughter in order to consider the allegation in its best-interests analysis. We have held that evidence of abuse of a sibling is "relevant in child custody and visitation proceedings to show the overall home environment and the interaction of the parents and children within it, now or in the past." *Brown v. Brown*, 154 Vt. 625, 632, 580 A.2d 975, 979-80 (1990). Just as it was in *Brown*, evidence that father abused stepdaughter was relevant to the court's best-interests analysis. It was even more relevant in this case than in *Brown* because mother sought the modification not just incidentally to her daughter's accusation, but specifically because of the accusation. But for the accusation, there was no risk to the boys; and but for that risk, there was no basis for limited or supervised contact. Abuse was relevant, however, only insofar as the court was persuaded by the evidence. Left unproven, the mere accusation standing alone could not sustain mother's burden to show, as required under § 665(b), that father presented a definite risk to the boys justifying limits on his rights to parent-child contact. See *Bell v. Squires*, 2003 VT 109, ¶ 14, 176 Vt. 557, 845 A.2d 1019 (mem.) (explaining that moving party has the burden to demonstrate why a change in custody is warranted and that family court has broad discretion in the custody context).

## VII. Parent-Child Contact and Shared Custody

¶ 38. Mother argues that the court's order effectively grants the parties shared custody in violation of the statutory prohibition against awarding shared parental rights when the parents do not

agree to do so. Under 15 V.S.A. § 665(a), "[w]hen the parties cannot agree to divide or share parental rights and responsibilities, the court shall award parental rights and responsibilities primarily or solely to one parent." Mother contends that by granting legal rights to father and physical rights to mother, and then awarding father contact half the time the children are in her titular custody, the court's order amounts to shared custody in what mother characterizes as "an end-run around the statute." We affirm the court's order.

¶ 39. "The meaning of § 665(a) is plain: where the parents cannot agree, the court must award primary (or sole) parental rights and responsibilities to one parent." *Cabot,* 166 Vt. at 493, 697 A.2d at 649. This requirement does not mean that the court must award all rights and responsibilities to one parent, and the family court still has broad discretion in drafting parental rights and responsibility orders to serve the best interests of the children. See *Shea v. Metcalf,* 167 Vt. 494, 500, 712 A.2d 887, 891 (1998) (affirming the family court's order dividing legal rights and responsibilities between the parents). The statute's purpose is to avoid the disruption to children caused by forcing unwilling parents to engage in joint decision-making. *Cabot,* 166 Vt. at 494, 697 A.2d at 650 ("[B]y forcing unwilling parents to share parental rights and make joint decisions, a court risks placing a child in the middle of constant and harmful disputes . . . .").

¶ 40. We conclude that the family court's order does not violate the statute because it does not force the parents to share decision-making authority. The court granted father legal rights and responsibilities, and mother physical rights and responsibilities. The family court made this decision based on its finding that the parties were both very involved in the children's lives and continued to communicate well concerning the boys, even after stepdaughter's allegations that father abused her. The court explained that

> although [the parties] cannot continue to share both legal and physical parental rights and responsibilities in the way they did before what is necessary is to set up a structure where one of them has decision-making in each of those areas, but we do want to take advantage of the fact that they still are able to communicate.

The court's order strives to give each parent some control over the children's lives without forcing the parents to share authority over a particular area. The result is similar to one we affirmed in *Shea*, where the family court granted mother physical rights and responsibilities, and divided legal rights and responsibilities between father and mother. *Shea*, 167 Vt. at 500, 712 A.2d at 891. In that case, we explained that the court's "order avoids the problems of joint decision-making while satisfying the Legislature's intent that children retain 'the opportunity for maximum continuing physical and emotional contact with both parents.'" *Id.* (quoting 15 V.S.A. § 650).

¶ 41. Mother contends that by dividing legal and physical responsibility between the parties the court is forcing her into conflict with father because she has "daily care and control of children whom she has virtually no legal decision-making authority over." Although we agree that routine splitting of physical and legal rights and responsibilities can be unwise, in some situations it is appropriate to grant one parent legal rights and the other physical rights. This division does not run afoul of the statutory requirement because each parent is vested with control in a particular area. See *Kasper v. Kasper*, 2007 VT 2, ¶ 4, 181 Vt. 562, 917 A.2d 463 (mem.) (affirming order granting father physical custody and mother legal custody); *Gazo v. Gazo*, 166 Vt. 434, 443, 697 A.2d 342, 347 (1997) (noting that while the court "must ensure that one parent is the child's primary parent, the court does retain some flexibility to fashion an award that keeps both parents involved in decision-making"). As explained above, the court found that the parties were equally qualified to provide for the children's best interests under all but one of the statutory factors. Thus, we cannot say that the court abused its discretion in choosing to award physical rights to mother and legal rights to father. "Where the family court's award of custody reflects its reasoned judgment in light of the record evidence, its decision may not be disturbed." *Kasper*, 2007 VT 2, ¶ 5.

¶ 42. Mother also argues that by equalizing the time the boys spend with mother and father, the court's order effectively grants the parties shared physical custody and thus violates

the statute.[6] We are not persuaded that the court's order amounts to shared physical custody. The statute's prohibition against shared custody is not satisfied by simply ensuring that one parent, by percentage, has more than fifty percent of rights and responsibilities; rather, the statute aims to designate a parent who has primary responsibility for an area of authority to avoid forcing parents to cooperate. *Cabot*, 166 Vt. at 493 n.4, 697 A.2d at 650 n.4. While father is the primary parent in the area of legal rights, mother is the children's primary physical custodian. Physical custody is not simply about the time a child spends with a parent. As the statute explains, physical responsibility "means the rights and responsibilities to provide routine daily care and control of the child subject to the right of the other parent to have contact with the child." 15 V.S.A. § 664(1)(B). Although father has substantial contact with the boys, mother is still the custodial parent and retains authority regarding the boys' "routine daily care and control," *id.*, even while they are in the physical company of their father.

*Affirmed.*

---

[6] In *Heffernan v. Harbeson*, in rejecting a father's request for greater equalization in parent-child contact time, we responded that the trial court was not required to absolutely equalize "the time that the child spends with each parent [because] that would be shared physical custody." 2004 VT 98, ¶ 15, 177 Vt. 239, 861 A.2d 1149. Although this observation might suggest an opposite outcome from the one reached in this case, the issue of whether such an arrangement would run afoul of 15 V.S.A. § 665(a) was not presented there, "thus the dicta implied in that case is not controlling precedent here." *Vella v. Hartford Vt. Acquisitions, Inc.*, 2003 VT 108, ¶ 5 n.2, 176 Vt. 151, 838 A.2d 126.