2008 VT 112

## State of Vermont v. Jonas Dixon

[967 A.2d 1114]

No. 07-457

Present: **Reiber, C.J., Dooley, Johnson and Burgess, JJ., and Pearson, Supr. J., Specially Assigned**

Opinion Filed August 14, 2008

Motions for Reargument and To Amend Decision Denied September 30, 2008

94

*Robert Butterfield,* Caledonia County State's Attorney, St. Johnsbury, for Plaintiff-Appellee.

*Matthew F. Valerio,* Defender General, and *Anna Saxman,* Deputy Defender General, Montpelier, and *Kerry B. DeWolfe* of *Rubin Kidney Myer & DeWolfe,* Barre, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** In this interlocutory appeal, defendant appeals from the district court's denial of his motion to transfer his trial for second-degree murder, 13 V.S.A. § 2301, to juvenile court. We conclude that the district court erred in several respects in evaluating the transfer motion. Accordingly, we reverse and remand.

¶ 2. The facts below were undisputed for purposes of ruling on the transfer motion. On January 27, 2007, shortly before 1:00 a.m., defendant, then fifteen years old, shot and killed a man in the

living room of defendant's home, a trailer in Sutton, Vermont. The man, who was intoxicated at the time, had arrived around 11:30 p.m. on January 26, 2007 to have sexual relations with defendant's mother. Defendant heard the two having sex and became angry. Soon after, he loaded a twelve-gauge shotgun that he kept in his room for turkey hunting and confronted the man in the living room in an effort to get him to leave. A struggle ensued, and defendant shot the man in the chest at close range; the man died at the scene.

¶ 3. Defendant's mother has been diagnosed with bipolar disorder. When defendant was approximately three years old, she was hospitalized at the Vermont State Hospital. When she took her medication, her symptoms were manageable, but when she did not, she became psychotic, delusional, and paranoid. Until 2003, she was married to defendant's father, who was verbally and physically abusive to her and defendant. Defendant's mother and father separated in 2003 after the father was charged with sexual assault. Defendant's father died in a car accident in 2004 pending sentencing. At the time of defendant's father's death, mother was taking her medication and doing well.

¶ 4. In February 2006, mother's mental health began deteriorating. She stopped taking her medication and left her job because she believed a coworker was putting chalk in her drink. Throughout the spring and summer, her mental health worsened. She was hearing voices, believed that a family was living under her trailer, and was convinced that she was nursing a number of imaginary babies. In part because of these delusions, in September 2006, defendant's grandmother took defendant's mother to the emergency room. The hospital prescribed a new drug, but her insurance would not pay for it. She promised to take the medication previously prescribed to her, but did not do so.

¶ 5. Grandmother spoke with defendant and his younger sister three or four times daily during this period. On bad days, mother was difficult to talk with, walked around the house naked, and played her music very loudly. In the fall of 2006, defendant spoke with his grandmother about men coming to the trailer to have sex with his mother. Defendant told his grandmother that he thought these men were perverts and that they were taking advantage of his mother. He also told his grandmother that he had thought about shooting bottle rockets into his mother's bedroom on one occasion when she had a man over. Defendant told his sister that

he would get mad about the men coming over to have sex with his mother, and that he was going to "do something" if any of the men came to the house again.

¶ 6. During the winter, mother's behavior continued to deteriorate. She continued to believe that a family was living under her trailer, and went so far as to leave a Christmas card under the trailer for them. She also pulled the plastic insulating skirting off around the trailer, causing the pipes to freeze and the trailer's plumbing to fail. On January 12, 2007, defendant's sister called their grandmother asking her to come to the trailer. When defendant's grandmother arrived, defendant's mother had the music on full blast and was acting very aggressively. She refused to let defendant's grandmother into the house. When grandmother eventually got into the trailer, she saw defendant's mother yell at his sister, grab her, slap her, and pull her hair. After two or three hours, grandmother was able to leave with the children, and they spent the night at her house. The following day, mother went to pick up the children. When grandmother told mother that she couldn't take the children, mother flew into a rage. Grandmother called 911, and the police came to her house. The police declined to get involved, and the children reluctantly left with their mother. On the way home, defendant jumped out of the car and told his mother he was not going home with her until she took her medication.

¶ 7. The following week, defendant's sister told her grandmother that she could not take it anymore. Grandmother told her to tell a teacher about what was going on at home. On January 24, 2007, defendant's sister gave a letter to her teacher, who gave it to the school's principal on January 25, 2007. The principal contacted the Department for Children and Families (DCF). Later that day, no one came to pick up defendant's sister after school. Defendant, who was at home, called his grandmother and said that his mother was not getting out of bed. Mother eventually called the school to say that she was coming to pick up defendant's sister. The principal was concerned about the students' safety and put the school into a "lockdown." Defendant's mother, however, had already arrived at the school, and came into the principal's office to get defendant's sister. When defendant's sister refused to leave with her mother, mother became enraged and stormed out, slamming a door behind her so hard that the window in the door broke. After mother left, a DCF worker called and said that they

would begin their investigation the following day. Ultimately, defendant's sister was picked up by her grandmother and again spent the night at her home.

¶ 8. Grandmother testified as follows about the events leading up to the shooting. On January 26, 2007, a DCF worker came to grandmother's home to meet with defendant's sister. The DCF worker told grandmother that she would be speaking to mother that afternoon. After taking a call on her cell phone, however, the DCF worker changed her plan and told grandmother that she would not be going to see mother until the following week. The DCF worker also told grandmother that the courts closed at 4:30 p.m. and that there was no time to get an emergency detention order. Thus, the DCF worker told grandmother, defendant's sister would have to return to her mother's home for the weekend. A Youth Services representative had earlier told grandmother that they would "worry about [defendant] later, right now we'll worry about [his sister]." Around 5:30 p.m., grandmother brought defendant's sister home. When grandmother checked back in with the children around 8:30 p.m., everything appeared to be quiet. Just before midnight, the man arrived at the Dixon trailer to have sexual relations with defendant's mother.

¶ 9. At approximately 12:57 a.m., defendant's mother called 911, indicating that someone had been shot and that an ambulance was needed. She stayed on the phone for about a minute and was then replaced by defendant. Defendant stayed on the phone with the dispatcher until police arrived, approximately twenty-seven minutes later. Defendant was hyperventilating, moaning, and repeating, "Oh my God, oh my God. What have I done? I don't know what the f___ I just did! I don't know what the f___ I just did!" He told the dispatcher, "I was so f___ing pissed, I don't know! I wanted him out of the house — I wanted him out!" When asked where the man had been shot, defendant stated, "I don't know. I just f___ing pulled the shotgun on him and told him to get the f___ out. Then he tried to attack . . . [to] take it away and I pulled the trigger! I just f___ing told him to leave. I pulled the gun on him and told him to f___ing leave. He tried to f___ing take it and I shot him! Oh no, my life is over. I'm just going to f___ing go and kill myself. I'm not going to go to f___ing jail. I told him to get out and he f___ing tried to get the gun! It wasn't my fault. I was scared!"

¶ 10. When asked why he wanted the man out, he exclaimed, "Because he was f___ing my mom! I wanted him out! I wanted

him out!" Defendant told the dispatcher that he had shot the man with a shotgun and that, "It was four shot. I'm not sure that is strong enough to kill anybody. It probably is. I don't know. I'm f___ing stupid as hell! Why did I do that! I'm so f___ing scared. He f___ing came at me. I pointed the gun at him and told him to get the f___ out. He f___ing came at me. I was scared. I thought he'd take it and shoot me!" At one point during the call, defendant stated "If he dies, I'm going to be in a lot of f___ing trouble." Defendant made numerous other statements during the 911 call, including several about how he became scared when he felt that the man was trying to get the gun away from him. He said over and over again, "What did I do?", "Why the f___ did I do it?", and "I can't believe I did that."

¶ 11. Defendant was charged with second-degree murder, 13 V.S.A. § 2301, and committed to the custody of Vermont's juvenile-detention facility. On March 27, 2007, he was released into his grandparents' custody, and has been on conditional release ever since. He has not violated the conditions of that release, and is receiving academic tutoring and psychotherapy at this time. Because defendant was between the ages of fourteen and sixteen at the time of the killing, the district court had discretion to transfer the case to the juvenile court. See 33 V.S.A. § 5505(b) ("If it appears to any court of this state in a criminal proceeding . . . that the defendant had attained the age of 14 but not the age of 16 at the time an offense specified in [§ 5506(a)] was alleged to have been committed, that court may forthwith transfer the proceeding to the juvenile court . . . ."); id. § 5506(a)(5) (specifying that murder prosecutions are subject to the transfer provisions of § 5505(b)).

¶ 12. In connection with defendant's motion to transfer, at the request of his counsel, defendant was examined by Dr. Kinsler, a clinical psychologist. Dr. Kinsler met with defendant just a few days after the shooting on February 1, 2007. Dr. Kinsler also met with defendant on February 5 and 19, 2007. Dr. Kinsler reviewed police investigative paperwork, notes from defendant's treating counselor, school records, the 911 tape, defendant's mother's mental-health records, DCF records concerning defendant's family, and deposition tapes of defendant's mother, a DCF worker, and the principal. Dr. Kinsler also conducted a telephone conference with defendant's treating counselor. Dr. Kinsler's testing and interviews showed that defendant has an IQ of 118, no brain

damage, and no mental illness. He opined that defendant is bright, with outstanding academic abilities. Dr. Kinsler found defendant to be introverted, sad, depressed, doleful, and self-deprecating. He indicated that defendant is not a chronically angry person.

¶ 13. Defendant gave Dr. Kinsler a lengthy account of the shooting. Defendant told Dr. Kinsler that, on the night of the shooting, he and his sister watched a movie with their mother in separate rooms through a common hook-up. Later that night, the shooting victim came to the house, and defendant knew that he was there to have sex with his mother. Defendant heard the two having sex and was extremely angry at the man for taking advantage of his mother. Defendant told Dr. Kinsler that he contemplated killing himself, but instead decided to use the gun to scare the man away. He loaded the gun and went out to the living room, where the man ran at defendant and grabbed the gun barrel and defendant's shoulder. Defendant told Dr. Kinsler that he felt the man would shoot him if he got the gun away from him, and defendant got scared. He took the safety off, and the two struggled for the gun. Feeling that he was about to lose the gun, defendant pulled the trigger. Defendant told Dr. Kinsler that he was hoping only to scare the man, and was not intending to shoot him.

¶ 14. Dr. Kinsler concluded that defendant's decision to come out with a loaded gun was a very poor and immature one. In Dr. Kinsler's opinion, the decision was driven by youth and immaturity. He felt that defendant was emotionally delayed by about two years due to his mother's mental illness and to the mental and physical abuse defendant had suffered. Dr. Kinsler concluded that defendant did not act aggressively or with any intention to kill and that defendant's use of a shotgun to scare was an error in judgment. In Dr. Kinsler's opinion, in defendant's mind he was defending his mother, not acting aggressively. Dr. Kinsler concluded that defendant should be treated in the juvenile justice system, and that being in the adult system would "harden" defendant. He also concluded that there was sufficient time to treat defendant in the juvenile system.

¶ 15. The State's expert, Dr. Linder, met with defendant and his counselor for a two-hour interview. Dr. Linder reviewed many of the same materials as Dr. Kinsler. Although Dr. Linder had not affirmatively diagnosed defendant, he felt that defendant may have

had post-traumatic stress disorder (PTSD) prior to the shooting and that his PTSD may be prolonged as a result of this event. Dr. Linder stated that getting upset was a typical response for defendant, and that this may be a symptom of PTSD. Dr. Linder stated that PTSD is difficult and time-consuming to treat, and that defendant cannot get the proper treatment during the limited time that he will be subject to juvenile supervision. Dr. Linder believed that the extent of defendant's need for mental health services may not be fully known at this time, further supporting his opinion that defendant will need treatment beyond the age of eighteen, when the juvenile court's jurisdiction will end.

¶ 16. As noted, defendant moved to transfer his case to juvenile court. After the contested hearing at which the above expert testimony was introduced, the trial court denied defendant's motion. In making its conclusions, the trial court considered the eight *Kent* factors for evaluating when a case should be tried in juvenile court, as well as three non-*Kent* factors. See *Kent v. United States*, 383 U.S. 541, 565-67 (1966) (setting out factors); *State v. Buelow*, 155 Vt. 537, 544-46, 587 A.2d 948, 953-54 (1990) (noting factors with approval, but holding that they are neither mandatory nor exclusive considerations for the court); see also *id.* at 549, 587 A.2d at 955-56 (Dooley, J., concurring) ("I would not *limit* the trial court to consideration of the *Kent* factors; I would require only that the trial court consider those factors along with others the court deemed appropriate in the case before it.").

¶ 17. We first recount the trial court's decision on the motion, and then consider defendant's specific claims of error. The first *Kent* factor is the seriousness of the alleged offense. *Kent*, 383 U.S. at 566. The trial court found that the charge against defendant was a very serious one, carrying a potential penalty of twenty years to life imprisonment. The court also determined that the legislative intent behind 33 V.S.A. § 5505(b) was to try the crimes listed in § 5506(a) in district court. The court found that defendant's actions resulted in the death of another person, which is the most serious personal injury. Accordingly, the trial court found that this factor militated against transfer.

¶ 18. The court found that the second *Kent* factor — whether the offense was committed in an aggressive, violent, premeditated, or willful manner, *Kent*, 383 U.S. at 567 — weighed against transfer because of defendant's decision to load the shotgun. The court concluded that defendant could have scared the man into

leaving by brandishing an *unloaded* gun, and that the only reason for loading the gun was to use it to harm the man. The court concluded that the 911 recordings showed that defendant was angry at the victim for having sexual relations with his mother, and further found that defendant's anger had been increasing over a period of months. The court noted that defendant's expert minimized the anger that was evident on the 911 recording. This anger was further evidenced by defendant's statement that he would do "something" the next time a man came over to have sex with his mother, and by his admission that he thought about shooting bottle rockets into his mother's room to discourage the men.

¶ 19. The third *Kent* factor — whether the offense was against persons or property, *Kent*, 383 U.S. at 567 — strongly weighed against transfer, the court found. As to the fourth factor — the prosecutive merits of the charge, *id.* — the court noted that there was no dispute that defendant fired the shot and that there was ample evidence to show that defendant was angry at the victim before the shooting. The court further noted that another judge had found probable cause for the charge. The court thus concluded that there was prosecutive merit to the State's charge, which militated against transfer.

¶ 20. The court moved on to consider the sixth *Kent* factor: defendant's sophistication and maturity, as determined by consideration of his home life, emotional attitude, and pattern of living.[1] *Id.* The court found that defendant understood the very serious nature of the shooting and its potential impact on his life, but that there was little positive in defendant's life on the night of the incident. The court recognized that it was difficult to name a single community resource that defendant's family did not attempt to access, all to no avail, and noted that this caused enormous frustration for defendant. Most troubling, the court noted, was that the DCF employee's statement that the "courts close at 4:30" was "flatly incorrect" in light of the fact that our courts routinely grant after-hours requests when child safety is at stake. The court characterized defendant's home life at the time of the murder as "deplorable," with the exception of the love and support that he got from his grandparents. The court found that this factor weighed in favor of transfer.

---

[1] The fifth *Kent* factor — the desirability of trial of multiple defendants in the same court, *id.* at 567 — was inapplicable on these facts.

¶ 21. The court also found that the seventh *Kent* factor — defendant's prior record, *id.* — weighed in favor of transfer, as defendant had had no prior contact with police or DCF except for the recent incidents in which he and his sister had sought help with the situation at their home.

¶ 22. The final *Kent* factor is the prospect for adequate protection of the public and reasonable rehabilitation of defendant — if he is found to have committed the charged offense — by the use of the facilities, services, and procedures available to the juvenile court. *Id.* The court found that defendant does not have a mental illness, but that he "may have post-traumatic stress disorder and, at the very least, has some symptoms from a traumatic past." The court noted that the experts both recommended "essentially the same basic rehabilitative regimen: continued therapy, educationally challenging programs, and continued residence with [his grandparents]." Further, the court found that both experts agreed that no "particular, necessary rehabilitative service is available in one court setting to the exclusion of the other."

¶ 23. The trial court also weighed three non-*Kent* factors in its decision. See *Buelow*, 155 Vt. at 546, 587 A.2d at 953 (*Kent* factors not exclusive). First, under the heading "System Breakdown," the trial court considered the role of DCF in the events leading to defendant's continued presence in his mother's home on the night of the shooting, and DCF's potential role in the supervision of defendant after a juvenile adjudication. The court noted that "[t]he combination of acute parental mental illness, desperation, drug and alcohol use, children, and firearms, was a recipe for disaster." The court did not, however, find that this fact militated in favor of transfer, because "[d]efendant knew people were working to get him and his sister out of the home at the time of this tragedy." Nor did the court explicitly find that this factor augured against transfer.

¶ 24. As a second non-*Kent* factor — under the heading "Public Accountability and Understanding" — the trial court considered the seriousness of the offense, Sutton's rural character, and the public's ability to follow the case through the judicial system. The court concluded that the Legislature intended, by including manslaughter and murder among the listed crimes in 33 V.S.A. § 5506(a), to provide greater public access generally to murder trials than to trials for offenses not listed in that subsection.

¶ 25. Finally, the court considered a third non-*Kent* factor: "Deterrence." The court concluded that, although deterrence is often a required response to violent crimes, any judicial response to this incident would not have a deterrent effect on future crimes, given the unique circumstances under which the shooting occurred. Although the court did not explicitly so conclude, it is plain that the court determined that this factor militated in favor of transfer to juvenile court.

¶ 26. The court ultimately concluded that a transfer to juvenile court would be inappropriate, because defendant had not met his burden of showing that transfer was warranted, and because "even a neutral comparison of the available venues would yield the same result." Considering all relevant factors — particularly the extraordinary seriousness of the charged crime, its effect on the community, and the juvenile court's inability to mandate prolonged treatment for defendant — the court concluded that the case should remain in district court.

¶ 27. We review the district court's decision on the transfer motion for abuse of discretion. *Buelow*, 155 Vt. at 546, 587 A.2d at 954. It was defendant's burden to demonstrate that his trial did not belong in the district court. *Id.* at 540, 587 A.2d at 950. We will not reverse the trial court's decision unless it has no reasonable basis in the record. *State v. Lafayette*, 152 Vt. 108, 110, 564 A.2d 1068, 1069 (1989). Discretionary rulings will not be disturbed if they have a reasonable basis in the record, even if another court might have ruled differently. *State v. White*, 172 Vt. 493, 500, 782 A.2d 1187, 1192 (2001). The court's discretion, however, though broad, is not "unbridled." *Buelow*, 155 Vt. at 546, 587 A.2d at 954. To the extent that the district court's transfer decision rests on conclusions of law, our review of those conclusions is nondeferential and plenary.

¶ 28. As noted above, consideration of the *Kent* factors, which the district court employed here, is "permitted, but not mandated" in Vermont. *Id.* at 544, 587 A.2d at 953. Rather than force our courts to mechanically apply factors that may not be relevant on the facts of every case, we have instead left transfer decisions to the sound discretion of the trial courts and continued to review those decisions "on a case-by-case basis." *State v. Smail*, 151 Vt. 340, 341, 560 A.2d 955, 955 (1989). "The trial court's discretion in transfer decisions is broader than in any other area.

We have refused to set any predetermined limits on that discretion." *In re J.G.*, 160 Vt. 250, 254, 627 A.2d 362, 364 (1993). As we noted fifteen years ago in *J.G.*, "we have not found in any case that the trial court abused its discretion in refusing to transfer a criminal case to juvenile court." *Id.* Underlying our consideration of the district court's decision to retain jurisdiction over a juvenile is the knowledge that the transfer decision involves — and often conclusively determines — "vitally important" rights of juvenile defendants, whom the law should be solicitous to protect. *State v. Lafayette*, 148 Vt. 288, 291, 532 A.2d 560, 562 (1987) (quoting *Kent*, 383 U.S. at 556), *overruled on other grounds by J.G.*, 160 Vt. at 252, 627 A.2d at 363; see 33 V.S.A. § 5501 (enumerating protective purposes of juvenile-proceedings statutes).

■ ■ ¶ 29. Thus, before we consider in sequence the details of the trial court's decision and the specific factors it balanced, we must note preliminarily that our review of the court's decision is not based solely on a mathematical computation of factors; to do so would suggest unnecessary limits on the exercise of discretion. See *State v. Fester*, 743 N.W.2d 380, 383 (Neb. 2008) ("Obviously, depending on the circumstances of a particular case, not all factors are placed on a scale and weighed in equal proportion."). The trial court must also exercise its discretion based on consideration of all the circumstances, whether assigned or assignable to any particular factor or factors. See *Marine v. State*, 624 A.2d 1181, 1185 (Del. 1993) (court determining whether to transfer case from criminal to juvenile court must consider the totality of the evidence). Here, the factual backdrop to defendant's actions is important as the context within which the trial court's discretion must be exercised. By any measure, the events leading up to the shooting involved the nearly total disruption of defendant's security in his own home and family. While the factual setting properly evoked the district court's attention and concern, the court did not assign it any particular weight. Similarly, the case must be considered in the context of this youthful defendant's increasing frustration at his inability to control the escalating events at home — events of the most humiliating and degrading nature for a child. That these events may have combined to overwhelm his youthful judgment should inform the district court's discretion in light of the special status accorded juvenile cases by the Legislature. 33 V.S.A. § 5501. We now turn to the

factors considered by the district court in ruling on the transfer motion.

¶ 30. First, we conclude that the district court erred in weighing the non-*Kent* factor titled "System Breakdown" against defendant. As the court noted, DCF plainly failed in its duty to protect or remove defendant and his sister from the deplorable living situation they endured in their mother's house. The court found that defendant and his younger sister were "living in a remote rural area with a mentally ill and unstable mother with firearms in the house." As the court went on to note, "[t]he combination of acute parental mental illness, desperation, drug and alcohol use, children, and firearms, was a recipe for disaster." The court went on to state, without explanation, however, that "[d]efendant knew people were working to get him and his sister out of the home at the time of this tragedy." The record discloses, however, that defendant and his sister had been left almost entirely to fend for themselves. Their pleas for help from the adults in positions of authority in their lives had had no effect on the "deplorable" living situation. Just the day before the shooting, according to grandmother, she was told that nothing could be done to help defendant and his sister after business hours, and that they would therefore have to pass another weekend in their mother's home. As the trial court noted, this representation was incorrect.

¶ 31. And yet the court weighed this factor *against* transfer to juvenile court, apparently out of a concern that the "officials responsible for child protection in the events leading to defendant's continued presence in his mother's home [would have a] potential role in the supervision of defendant after a juvenile adjudication." In light of this concern, the court concluded that "the presence of the children in the home under the then-existing circumstances provides *no justification* for transferring the case to juvenile court." (Emphasis added.) By weighing DCF's failings against the juvenile, the court improperly penalized the juvenile for the failings of a state agency over which he had no control.

¶ 32. The court also appears to have denied the motion to transfer in part to protect "the ability of the public to follow the case through the judicial system," noting that such openness "is a matter of importance to the community." This was not a proper consideration, and was not entitled to independent weight as a

matter of law. The Legislature has determined that a primary purpose of the juvenile court system is to protect juveniles from the "taint of criminality" that inevitably results from the publicity and permanence of convictions in the district court. See 33 V.S.A. § 5501. The other provisions of chapter 55 of Title 33, including the discretionary transfer provisions in § 5505, are to be construed to give effect to the purposes announced in § 5501. The court here failed to account, at least explicitly, for the important policies underlying those provisions, and thus it is unclear whether it properly exercised its discretion.[2] As noted above, however, the district court also rested its decision on five of the *Kent* factors. We consider them in turn.

■ ¶ 33. First, the court relied on the seriousness of the alleged offense. See *Kent*, 383 U.S. at 566. The court was plainly correct that second-degree murder is a serious offense, among the most harshly punished in our criminal code. There was certainly no abuse of discretion in so concluding.

■ ¶ 34. Second, the court concluded that the alleged offense was committed in an aggressive, violent, premeditated or willful manner. See *Kent*, 383 U.S. at 567. This conclusion rested on several findings: (1) "[t]he only reason for [d]efendant loading the gun was the possibility of using it"; (2) "[t]hreatening another with a loaded shotgun [was] an inherently aggressive action"; (3) "[d]efendant [did] not claim that the discharge of the weapon was accidental"; and (4) defendant's "response that evening was the result of anger which had been increasing over many months." On the other side of this factor, as defendant points out, was the evidence that there was a struggle over the gun; that defendant claimed to believe that the man would shoot him if defendant lost control of the gun; that defendant said he did not intend to shoot the man, but only to scare him. Further, defendant argues, the trial court did not credit Dr. Kinsler's opinion that defendant's choice to confront the man with a loaded weapon was the result of emotional immaturity. Defendant's contentions on this point, at their core, amount to an argument with the factfinder's assessment of witness credibility and the weight given to testimony. It was within the province of the trial court to determine that

---

[2] The third non-*Kent* factor, "Deterrence," is not the subject of any claim of error on appeal.

weight, and we will not reevaluate the conflicting testimony or the credibility of witnesses. *Chase v. Bowen*, 2008 VT 12, ¶ 15, 183 Vt. 187, 945 A.2d 901. We find no error in the court's conclusion that the shooting was committed in an aggressive, violent, or premeditated manner.

¶ 35. The court next concluded that the nature of the offense "strongly weighs against transfer." Specifically, the court concluded that the crime was against a person, not against property, and resulted in death, "the most serious personal injury possible." This factor, under the facts before us, virtually collapses into the first factor: the seriousness of the offense. The court's findings on that factor included the fact that the allegations involved the loss of human life, and that the crime is among those listed in § 5506(a). Both of those findings, of course, will *always* be true in juvenile murder prosecutions, and will track precisely with the first factor. However, the trial court's balancing of the factors is not an exercise in sums, and the court was correct in concluding that the nature of this offense generally militated against transfer. Although the court was inarguably correct in that respect, we caution that, on remand, this factor is not entitled to great weight, because it is nearly identical to the *Kent* factor concerning the offense's seriousness.

¶ 36. The fourth *Kent* factor, which the court also found militated against transfer, is the prosecutive merit of the charge. We reiterate that *Kent*, and this factor, arose in a situation where transfer was sought *from* the juvenile court to the criminal court. Thus, in *Kent* and the future cases in which it was expected to apply, the question of whether there was "prosecutive merit [to] the complaint, i.e., whether there is evidence upon which [an indictment might be returned]," *Kent*, 383 U.S. at 567, was an open question. In cases like the one before us today, however, this fourth factor cannot bear much, if any, dispositive weight. By definition, in all cases in which a juvenile defendant seeks transfer from the district court to the juvenile court, the "prosecutive merit" question has already been decided by the court's finding of probable cause. Indeed, in the instant case, the court explicitly found that "[a] judge has found probable cause for this charge. There is prosecutive merit to the State's charge as that [phrase] is used under the *Kent* criteria." Because this will be true, as a matter of simple procedural logic, in every case where transfer to

juvenile court is sought under § 5505(b), the district court's conclusion that this factor weighed against transfer was erroneous.

¶ 37. On this point, a Delaware case is instructive. In *Marine v. State*, 624 A.2d at 1185, the Delaware Supreme Court held that the criminal court, when considering a motion to transfer a juvenile prosecution from adult court to juvenile court, must consider the totality of the evidence, including any defenses, in order to conclude that the "prosecutive merit" factor favors retention of the case in adult court. The state argued in *Marine* that the proper standard was the one that the district court applied in the instant case: whether there was probable cause for the charge. Rejecting that argument, the Delaware court held that the criminal court must examine the totality of the evidence, not just the state's evidence, in order "to provide a judicial counter-weight to any perceived prosecutorial charging excess, thereby reconciling the Delaware reverse amenability statute with the state and federal Constitutional guarantees of due process and equal protection." *Id.* Although we do not adopt the *Marine* holding today, we do agree with the Delaware court that this factor cannot be satisfied by a mere showing of probable cause.

¶ 38. The *Marine* standard, requiring an evaluation of defenses at such an early stage of the prosecution, seems to us rather unwieldy; it would seem to require a mini-trial at a stage of the proceedings when the defense might be well-served not to reveal its hand. The better approach to the prosecutive-merit analysis is for the court to determine whether the State can make out a prima facie case for the charged crime. That is, the State must prove that it has evidence that "would fairly and reasonably tend to show beyond a reasonable doubt that defendant committed the offense." *State v. Valyou*, 2006 VT 105, ¶ 4, 180 Vt. 627, 910 A.2d 922 (mem.). Thus, the district court erred as a matter of law in analyzing the fourth *Kent* factor.

¶ 39. The final *Kent* factor that augured against transfer, according to the district court, was the prospect for adequate protection of the public and the likelihood of reasonable rehabilitation of defendant. See *Kent*, 383 U.S. at 567. The district court found that there was no evidence in the record that the services available in juvenile court were different in kind from those available in district court, and found that prosecution in district court was unlikely to result in defendant's being "hardened." Thus,

the court's focus was on the temporal differences between the two courts; in this regard, the court concluded that defendant's "supervisory needs . . . will exceed the temporal grasp of the juvenile court." This statement is supported by the testimony of the State's expert, and we will not question on appeal the factfinder's decision to credit that testimony over the contrary testimony of defendant's expert. *Chase*, 2008 VT 12, ¶ 15. Both expert witnesses testified that there was no public-protection justification for denying the transfer motion, and nothing in the record suggests otherwise. Indeed, the fact that defendant has now been maintained on conditions of release, and has been receiving outpatient treatment for well over a year, can only support the conclusion that public protection does not require adult prosecution. Nonetheless, it was within the district court's discretion to conclude that, despite there being no public-protection basis for retaining jurisdiction, the need for more time to rehabilitate defendant supported trial in district court.

¶ 40. Accordingly, we reverse and remand so that the district court may reevaluate defendant's transfer motion in light of this opinion. We do not dictate here how the trial court should rule. Rather, we remand in recognition that the trial court has seen the witnesses, heard their testimony, viewed the exhibits, and is therefore in a better position than this Court to reweigh the factors pertinent to transfer in light of our decision today. The district court must also evaluate anew the "prosecutive merit" factor in light of our holding regarding the proper standard. See *supra*, ¶¶ 36-38. It does not appear that any new evidence need be taken in order to conduct that evaluation, or for any other purpose, on remand. Rather, the court can exercise its discretion to make new findings as necessary, and weigh the factors it deems pertinent, giving due effect to the protective purposes enunciated in § 5501 in light of the evidence already introduced and the standards announced in this opinion. The court shall do so forthwith.

*Reversed and remanded for further proceedings consistent with the views expressed herein.*