2009 VT 51

## State of Vermont v. Yosef E. Pitts

## State of Vermont v. Sequoya Pitts

[978 A.2d 14]

Nos. 07-077 & 07-219

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 22, 2009

72

*Thomas Donovan, Jr.*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Anna Saxman*, Deputy Defender General, Montpelier, and *Alison Arms*, Office of the Public Defender, Burlington, for Defendant-Appellant Sequoya Pitts, and *Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant Yosef Pitts.

¶ 1. **Reiber, C.J.** Defendants Yosef and Sequoya Pitts appeal from judgments of conviction, entered upon conditional plea agreements, for possession of illegal substances. Each claims that the trial court erroneously denied a motion to suppress based on an illegal search of Yosef's person and Sequoya's home.[1] We affirm in part and reverse in part.

¶ 2. The facts as revealed by the trial record and the court's findings may be summarized as follows. In late December 2005, two South Burlington police officers served a subpoena on an individual in connection with a major drug distribution case. The police had information that the individual in question had sold drugs from a white Jeep, accompanied by an Hispanic male from New York. While serving the subpoena, the officers observed a male who appeared to be Hispanic in the apartment. The individual appeared to be nervous about the officers' presence, and had a New York accent. He identified himself to the officers as defendant Yosef Pitts. After serving the subpoena, the officers waited outside the apartment, observed Yosef enter a taxi, and decided to follow. The officers called the taxi dispatcher and were informed that the taxi was going to an address on Henry Street in Burlington and that the taxi made the same run to the same address several times a day. This aroused the officers' suspicions further because drug dealers routinely use taxis to avoid detection.

---

[1] We refer to defendants by their first names solely for purposes of clarity.

¶ 3. As Yosef exited the taxi, the officers approached and asked if they could speak with him. One of the officers also asked the driver for permission to search the taxi for anything Yosef might have left inside. Yosef agreed to talk, and an officer asked him where he was going. He responded with the address on Henry Street. The officer inquired as to whether he had any identification; Yosef gave his name and further explained that he was from New York but had been living in Vermont with his sister. The officer then asked if he had any weapons on him. According to the officer, Yosef told him "I have a knife in my pocket, here," and the officer then "took the knife off [Yosef], and . . . patted him down for weapons." During the pat-down search the officer felt a "big wad of cash" and asked Yosef how much was there; Yosef indicated several hundred dollars. The officer then asked Yosef if he had any drugs on him. Yosef indicated that he had "a little weed" in his pocket. The officer testified that Yosef "guided" him to the location of the drugs, which the officer then removed, revealing about two grams of marijuana. The officer indicated that he then obtained consent to a complete search of Yosef's person. When they were done, the officers placed Yosef in their cruiser and approached the house on Henry Street. The officer testified, and the court found, that their purpose in going to the house was "to corroborate Mr. Pitts' identity and see if there was drug use or drug dealing within the residence."

¶ 4. Yosef's sister, Sequoya, answered the door. After confirming her identity, the officers informed Sequoya that they had Yosef outside, that he had been coming to see her, and that they had taken a large amount of money and some marijuana from him. The officers sought and received permission to enter the house, where they observed what appeared to be a marijuana roach on a dresser in the living room. An officer then asked for permission to search the house, explaining that he could apply for a warrant but that it would take several hours and require leaving an officer at the scene. Sequoya was concerned about the effect of the search on her son, who would soon be returning from school, and signed a consent form allowing the search. Among other items, a search of the house revealed additional marijuana, cocaine, and assorted drug-related paraphernalia. Both defendants were subsequently charged with possession of illegal substances.

¶ 5. Yosef and Sequoya filed separate motions to suppress the drugs and other evidence taken from the searches. Yosef claimed

that he was effectively seized without reasonable suspicion or probable cause during the encounter outside his sister's residence, and that all of the evidence elicited as a result of the illegal seizure must therefore be suppressed. He also claimed that his consent to the search of his person was in response to a "claim of lawful authority" and therefore involuntary. Sequoya similarly claimed that Yosef had been illegally detained without reasonable suspicion of wrongdoing, and that the illegal detention had tainted all of the evidence subsequently seized from her residence. She further asserted that her consent to the officers' search of the residence was involuntary. Following a joint hearing, the trial court issued separate written decisions. As to Yosef, the court concluded that the encounter with the officers was consensual and did not rise to the level of a seizure requiring reasonable suspicion of wrongdoing, and further concluded that Yosef had voluntarily consented to the search of his person, finding that there was "no evidence of physical or psychological coercion forcing Mr. Pitts to consent to the search." As to Sequoya, the court concluded that she lacked standing to challenge the stop and search of her brother, and that she voluntarily consented to the officers' entry and search of her home. Accordingly, the court denied the motions. Both defendants thereafter entered conditional pleas, reserving the right to challenge the court's rulings on appeal.

## I.

¶ 6. In reviewing a motion to suppress, we apply a de novo standard to the trial court's legal conclusions and a clear-error standard to its factual findings. *State v. Lawrence*, 2003 VT 68, ¶ 9, 175 Vt. 600, 834 A.2d 10 (mem.). Yosef contends that he was effectively seized during the encounter with the police outside his sister's home; that the police lacked reasonable suspicion to justify the seizure; and that the illegality vitiated any subsequent consent to the search of his person. The claim requires us to determine at what point, if any, during the encounter with the police Yosef's right to be free from unreasonable search and seizure was implicated.

¶ 7. In balancing the individual's right to privacy against the state's interest in crime prevention and detection, courts — including our own — have distinguished various types of interactions between citizens and the police based on the degree of police

intrusion and the concomitant level of justification required. Both the United States Supreme Court and this Court have recognized that a seizure does not occur when an officer merely approaches an individual and asks certain questions, and therefore no minimal level of suspicion of wrongdoing is necessary. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Florida v. Royer*, 460 U.S. 491, 497 (1983); *State v. Sprague*, 2003 VT 20, ¶ 26, 175 Vt. 123, 824 A.2d 539. The next level of intrusion occurs when a police officer has reasonable and articulable grounds to suspect that an individual is engaged in criminal activity. In these circumstances, the officer may briefly detain the individual to investigate the circumstances that gave rise to the suspicion, while ensuring that the detention is "reasonably related in scope" to the circumstances that justified it. *Terry v. Ohio*, 392 U.S. 1, 29 (1968); *State v. Ford*, 2007 VT 107, ¶ 4, 182 Vt. 421, 940 A.2d 687 ("Under both the Vermont and the United States Constitutions, we have recognized that a brief detention, its scope reasonably related to the justification for the stop and inquiry, is permitted in order to investigate the circumstances that provoked the suspicion." (quotation omitted)). A full-scale arrest or the "functional equivalent" (i.e., where the level of restraint has become too intrusive to be classified as an investigative detention) requires the highest level of justification — "probable cause" to believe that a crime has been committed. *State v. Chapman*, 173 Vt. 400, 403, 800 A.2d 446, 449 (2002).

■ ¶ 8. The point at which mere questioning or "field inquiry" becomes a detention requiring some level of objective justification is not susceptible of precise definition. In *Terry*, the Supreme Court held that a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." 392 U.S. at 19 n.16. The oft-stated standard for deciding this question is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436; see also *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (a seizure has occurred "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"); *State v. Paquette*, 151 Vt. 631, 634, 563 A.2d 632, 635 (1989) ("A *Terry* seizure occurs when . . . 'a reasonable person would have believed he was not free to leave if he had not responded . . . .'" (quoting *State v. Kettlewell*, 149 Vt. 331, 335, 544 A.2d 591, 593 (1987)). As the high court has

observed, however, there is no "litmus-paper test for distinguishing a consensual encounter from a seizure." *Royer*, 460 U.S. at 506 (quoted in *Sprague*, 2003 VT 20, ¶ 27). The test is "necessarily imprecise" precisely because it is designed to assess police conduct "taken as a whole," and therefore "what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (quoted in *Sprague*, 2003 VT 20, ¶ 27).

¶ 9. This contextual approach has led, in turn, to a recognition among many courts that while "mere questioning" may not constitute a seizure per se, pointed questions about drug possession or other illegal activity in circumstances indicating that the individual is the subject of a particularized investigation may convert a consensual encounter into a *Terry* stop requiring objective and articulable suspicion under the Fourth Amendment. A case on point is *State ex rel. J.G.*, 726 A.2d 948, 950 (N.J. Super. Ct. App. Div. 1999), where a police officer approached two individuals in a train station and asked several questions about their point of origin before asking the adult whether "there was anything on him that I should know about" and the juvenile whether there was "anything on him that he shouldn't have." Each responded in the negative, but assented when the officers asked for permission to search, which revealed marijuana.

¶ 10. In analyzing the defendant's claim that he had been illegally detained, the appeals court acknowledged that the encounter had occurred in a public place, that no physical coercion was evident, and that the officer's tone throughout the incident was "unexceptional." *Id.* at 953. It concluded, nevertheless, that the officer's pointed inquiries as to whether the defendant was in possession of anything illegal made it clear that he was the "subject of a particularized investigation by the questions presupposing the suspicion of criminal conduct" and was "not free to leave." *Id.* at 953-54. At that point, the court concluded, "the field inquiry was automatically converted to a *Terry* stop which would require a reasonable and articulable suspicion before the search was conducted." *Id.* In this regard, the court held that the officer lacked any reasonable suspicion of wrongdoing, and that absent a basis for the stop the subsequent search, "with or without [the defendant's] permission," was invalid. *Id.* at 956.

¶ 11. A similar case is *State v. Alverez*, 2006 UT 61, ¶ 5, 147 P.3d 425, where two uniformed police officers approached the defendant in a parking lot and asked whether he knew that his "vehicle was uninsured," whether he knew that the car was "suspected of being connected to drug dealing," and finally whether he "had any drugs on him." The court held that the officers' inherently "accusatory" questions about "not one, but two illegal acts" "exceeded 'mere questioning' and created a confrontational encounter" which a reasonable person would not have felt free to disregard or simply leave. *Id.* ¶¶ 11-12. As the court explained, "[t]he accusatory nature of the questions and the context in which they were asked demonstrated a 'show of authority' sufficient to restrain Defendant's freedom of movement," requiring a reasonable and objective basis for the stop under the Fourth Amendment. *Id.* ¶ 12.

¶ 12. The Supreme Court of New Mexico confronted a similar scenario in *State v. Jason L.*, 2000-NMSC-18, 2 P.3d 856, where police officers observed two young men on the street at night, one of whom appeared to be continually adjusting his waistband. The officers approached, asked the young men what they were doing, were told that they were "just walking," and then inquired if they "were armed." *Id.* ¶ 13. When the two failed to respond immediately, the officers repeated the question and were told "no." *Id.* The officers nevertheless conducted a pat-down search, which revealed a .22 caliber pistol. The state argued that the encounter was consensual until the pat-down search, but the court concluded that "[t]he tenor of the encounter changed when [the officer] asked Defendant if he was in possession of weapons," *id.* ¶ 17, which, together with the suspects' awareness that the officers "had been observing them prior to the encounter" conveyed a clear message that they were "not free to leave" under traditional Fourth Amendment analysis. *Id.* ¶¶ 17, 19. Concluding that the officers lacked a reasonable suspicion of criminal activity, the court ruled that the evidence must be suppressed under the Fourth Amendment. *Id.* ¶ 23.

¶ 13. Other courts applying traditional Fourth Amendment search-and-seizure law have reached similar conclusions where relatively innocuous field inquiries concerning the subject's identity, address, or destination progress to more pointed police inquiries about drug possession or other criminal conduct suggesting that the person is the focus of a particularized police investigation into criminal activity. See, e.g., *United States v.*

*Nunley*, 873 F.2d 182, 184-85 (8th Cir. 1989) (holding that consensual encounter became seizure which invalidated subsequent consent to search where police officers' statements to the defendant that they were attempting to stop the flow of drugs indicated that the defendant was the "particular focus of a narcotics investigation"); *State v. Contreras*, 742 A.2d 154, 160-61 (N.J. Super. Ct. App. Div. 1999) (concluding that narcotics officers "clearly conveyed to defendants the message that the officers suspected them of criminal activity," which escalated consensual encounter to seizure where the officers had defendants exit a train, explained that they were investigating drug trafficking, and asked defendants if they were carrying any contraband); *Parker v. Commonwealth*, 496 S.E.2d 47, 49, 51 (Va. 1998) (holding that, where police clearly followed the defendant and then "asked the defendant if he had any guns or drugs in his possession," a reasonable person would not have believed that he was free to leave).[2]

¶ 14. Assessed in light of these standards and authorities, and viewing the encounter in its full factual context, we conclude that a reasonable person in Yosef's circumstances would have concluded that he was the subject of a focused police investigation into criminal activity and was not free to disregard the officers' questions and requests. The encounter with the police, it bears emphasizing, did not begin at Henry Street, but at an earlier time and place several miles away, where Yosef was identified and questioned by officers serving a subpoena at a suspected drug house. As the officers acknowledged, their suspicions were immediately aroused because Yosef appeared to be nervous and

---

[2] We faced a somewhat similar issue in *State v. Hollister*, 165 Vt. 553, 679 A.2d 883 (1996) (mem.), where police officers observed two young men, including defendant, outside a library where a cherry bomb had exploded. The officers approached the two and asked what they were doing. During the conversation, an officer noticed the smell of alcohol on defendant, who admitted that he had been drinking. The officer asked if he could look in defendant's knapsack and then asked if the young men "had anything in their pockets that they should not have" and whether he could see. *Id.* at 553, 679 A.2d at 884. Defendant and the other young man then produced several baggies of marijuana. Although Justice Johnson would have held that the defendant was seized when the officer began to ask incriminating questions about illegal activity, *id.* at 554-55, 679 A.2d at 884 (Johnson, J., dissenting), the Court declined to reach the issue, conceding that there was a seizure but ruling that it was a legitimate *Terry* stop based on the reasonable suspicion of criminal activity, to wit possession of alcohol by a minor. *Id.* at 553, 679 A.2d at 884.

matched the description of an alleged accomplice in the drug-dealing operation.

¶ 15. Yosef plainly would have been aware that he was followed across town by the same two officers, who immediately approached his taxi driver for permission to search for anything that Yosef might have left inside. Although the officers' first few questions to Yosef were the kind that courts have uniformly held to be innocuous and nonconfrontational, they rapidly progressed to inquiries indicating a particularized suspicion of criminal activity. As noted, the officer asked Yosef if he had any weapons on him, although no circumstances suggested that he was armed. Yosef acknowledged that he had a knife in his pocket, which turned out to be a folding pocket knife. The officer testified that he then took the knife off him, patted him down for weapons, and "felt a big wad of cash" in his pocket. The money, according to the officer, "reinforced my suspicion of what might possibly be going on," and he next asked Yosef whether he had any drugs on him. Yosef again acknowledged that he did have a "little weed" in his pocket, and the officer asked for permission to remove it, to which Yosef again assented.

¶ 16. While the record reveals neither physical restraint nor blatantly aggressive or intimidating language, these circumstances — including the fact that the suspect was obviously followed for a substantial distance, that his taxi was searched, and that he was successively questioned about weapons and drugs — are precisely the kind which courts have characterized as a particularized inquiry into criminal activity which the average person would not have felt free to disregard or terminate. We conclude, therefore, that Yosef was effectively seized for purposes of Fourth Amendment analysis.

¶ 17. In so holding, we are aware of the criticism engendered by several of the Supreme Court's seminal decisions governing consensual encounters, particularly *Bostick* and *United States v Drayton*, 536 U.S. 194 (2002). In both cases, the high court held that bus passengers subjected to organized police interrogations and searches were not detained, and remained free to decline the officers' requests and terminate the encounter where the police did not block the doors to the bus or otherwise employ physical force, weapons, or intimidating language. See *Bostick*, 501 U.S. at 436-38; *Drayton*, 536 U.S. at 203-04; see also *Mendenhall*, 446

U.S. at 554 (setting forth the criteria that might indicate a seizure, including the "threatening presence of several officers," the display of a weapon, physical restraint, and the "use of language or tone of voice indicating that compliance" is required). These decisions have been widely criticized for propounding an overly expansive view of the average person's capacity to disregard or terminate police questions and requests. See, e.g., D. Steinbock, *The Wrong Line Between Freedom and Restraint: The Unreality, Obscurity, and Incivility of the Fourth Amendment Consensual Encounter Doctrine*, 38 San Diego L. Rev. 507, 521-22 (2001) (characterizing the Supreme Court's approach as a "fictional construct" and "out of touch with societal reality"); R. Simmons, *Not "Voluntary" But Still Reasonable: A New Paradigm for Understanding the Consent Searches Doctrine*, 80 Ind. L.J. 773, 774-75 (2005) (noting the "nearly unanimous condemnation of the Court's rulings on consensual searches" and criticizing the *Drayton* holding as "at once absurd, meaningless, and irrelevant"); I. Midgley, Comment, *Just One Question Before We Get to Ohio v. Robinette: "Are You Carrying Any Contraband . . . Weapons, Drugs, Constitutional Protections . . . Anything Like That?"*, 48 Case W. Res. L. Rev. 173, 206 (noting the empirical research indicating that "most people believe they are in custody as long as a police officer continues to ask them questions"); *State v. Carty*, 790 A.2d 903, 910 (N.J. 2002) (observing that most citizens would view police requests to search as having the force of law).

¶ 18. However one views the Supreme Court's approach as reflected in cases like *Bostick* and *Drayton*, we are satisfied that our conclusion here is consistent with both cases and with subsequent Fourth Amendment decisions applying them. *Bostick* held merely that general police questioning within the confines of a bus did not establish a seizure "per se," 501 U.S. at 440, while *Drayton* reaffirmed that rule and added that consensual searches did not require a police advisement that the person is free not to cooperate. 536 U.S. at 206-07. Although both cases involved potentially incriminating questions put to passengers by officers who had identified themselves as narcotics agents on the lookout for illegal drugs, there was nothing in the encounters to suggest a particularized suspicion of wrongdoing among any of the passengers questioned. Courts have therefore had little difficulty distinguishing *Bostick* and its progeny from situations where, as

here, the officers' questions and the surrounding circumstances combine to make the defendant "aware that he was the subject of a particularized investigation." *State ex rel. J.G.*, 726 A.2d at 953-54 (distinguishing *Bostick* where the officer's conduct and questions indicated that the defendant "was or might be involved in criminal conduct" and was "not free to leave"); *Alverez*, 2006 UT 61, ¶ 12 (distinguishing "mere police questioning" in *Bostick* from questioning where "[t]he accusatory nature of the questions and the context in which they were asked demonstrated a show of authority sufficient to restrain Defendant's freedom of movement" (quotations omitted)).

■ ¶ 19. Other courts, to be sure, have reached similar holdings in reliance solely on state law, implicitly or expressly acknowledging the criticism of the high court's approach. See, e.g., *State v. Quino*, 840 P.2d 358, 359 (Haw. 1992) (relying on state constitution to hold that, although no physical force was used, defendant was effectively seized when "general" questioning by narcotics detectives turned to "inquisitory" questions about possession of drugs); *People v. Hollman*, 590 N.E.2d 204, 210 (N.Y. 1992) (relying on state common law to hold that field inquiry by narcotics officers in a bus terminal escalated into investigative detention requiring reasonable suspicion when officers requested consent to search for drugs). This Court has also consistently held that Chapter I, Article 11 of the Vermont Constitution provides a defense against invasions of privacy equal to or, in some cases greater than, the Fourth Amendment to the United States Constitution, and we have regularly invoked this principle to place reasonable restrictions on the scope of police authority to detain and search citizens. See, e.g., *Sprague*, 2003 VT 20, ¶ 16 (rejecting federal rule to conclude, under Article 11, that exit order during routine motor vehicle stop is a seizure requiring independent suspicion of criminal activity or reasonable concern for safety of officer); *State v. Morris*, 165 Vt. 111, 125, 680 A.2d 90, 100 (1996) (declining to follow United States Supreme Court decision allowing warrantless search of trash); *State v. Kirchoff*, 156 Vt. 1, 7, 587 A.2d 988, 992 (1991) (rejecting United States Supreme Court open fields doctrine). Consistent with these settled principles we conclude that Yosef was effectively seized under the Vermont Constitution as well, and that the police therefore required a reasonable and objectively based suspicion that he was engaged in criminal activity. *Ford*, 2007 VT 107, ¶ 4.

84

■ ¶ 20. As the State acknowledged at oral argument, however, the officers here were operating solely on a hunch; there was no reasonable and objective basis to suspect that Yosef was then in possession of illegal drugs or engaged in any other criminal activity sufficient to justify an investigative detention. The detention was plainly invalid, therefore, and it is equally plain that the illegal detention irremediably tainted the consensual search of Yosef's person which immediately followed. See *Royer*, 460 U.S. at 507-08 (where defendant was illegally detained when he consented to search of luggage "the consent was tainted by the illegality and was ineffective to justify the search"); *Sprague*, 2003 VT 20, ¶ 32 (invalidating consent search where there were no attenuating circumstances or "intervening events" between driver's illegal detention and subsequent consent that would obviate the taint of illegality). Accordingly, all of the evidence seized from Yosef should have been suppressed.

■ ■ ¶ 21. In addition to the evidence illegally obtained from his person, Yosef claims that the cocaine and marijuana subsequently seized from the search of the residence should have been suppressed as the tainted "fruit" of the initial illegality. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *State v. Phillips*, 140 Vt. 210, 218, 436 A.2d 746, 751 (1981). He essentially argues in this regard that, but for the evidence taken from his pockets, the police would not have approached his sister's house, sought and obtained entry, and discovered the additional drugs in the ensuing search. The record evidence does not support the claim. The investigating officer here testified that they approached the house to "[v]erify [Yosef's] ID and continue investigating whether this was some kind of drug operation." When the question was then posed, "if you hadn't talked to Yosef, you would have had no reason to go to 13 Henry Street," the officer initially responded "correct" but then qualified his response by recalling the information they had received earlier from the taxi company. In essence, the officer indicated that their interest in the house flowed from the taxi dispatcher's initial identification of 13 Henry Street as the address where a taxi was regularly sent from a suspected drug-dealing operation in Burlington. Their suspicions were aroused, the officer explained, because drug dealers regularly travel in taxis between locations to avoid police detection. Thus, the officers had ample information *independent* of the money and drugs seized from Yosef to investigate the residence.

That evidence did not, therefore, taint the additional evidence seized from the house, and its suppression was not required. See *Phillips*, 140 Vt. at 218, 436 A.2d at 751 (in determining "fruits" of the initial illegality, critical inquiry is whether the evidence " 'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable' " (quoting *Wong Sun*, 371 U.S. at 488)).

¶ 22. Yosef was charged with one count of possession of less than two ounces of marijuana and one count of possession of cocaine. Having upheld the search of the house from which the cocaine was seized, we find no basis to disturb the possession-of-cocaine conviction. The record is unclear, however, whether the possession-of-marijuana charge was based on the evidence illegally seized from Yosef's person or the marijuana legally seized from the house. Accordingly, the matter must be remanded to the district court for further proceedings to address this issue and make any necessary modifications to the judgment and sentence.

## II.

¶ 23. Turning from Yosef to Sequoya, we note that the latter also relies on the allegedly illegal detention of Yosef to support her claim that the evidence subsequently seized from the residence was tainted by the initial illegality and therefore should have been suppressed. The claim raises an interesting question concerning Sequoya's standing to assert the illegal detention of Yosef, but we deem it unnecessary to resolve the issue. For even assuming that Sequoya had standing under these circumstances, the record — as discussed above — does not establish the necessary causal nexus between the illegal detention of Yosef and the evidence subsequently seized from the house. Moreover, contrary to Sequoya's corollary claim, we conclude that the evidence supports the trial court's finding that Sequoya voluntarily consented to the officer's entry and search of the house.

¶ 24. As we have explained, "the inquiry in a consent search context is restricted to whether the consent was voluntary, not whether there was a 'knowing' and 'intelligent' waiver of a constitutional right." *State v. Zaccaro*, 154 Vt. 83, 88, 574 A.2d 1256, 1259 (1990) (citation omitted); accord *State v. Stevens*, 2004 VT 23, ¶ 11, 176 Vt. 613, 848 A.2d 330 (mem.); *Sprague*, 2003 VT 20, ¶ 23. Voluntariness is to be determined from the totality of the

circumstances, with the State carrying the burden "of demonstrating that the consent was freely given and not coerced by threats or force, or granted only in submission to a claim of lawful authority." *Sprague*, 2003 VT 20, ¶ 23 (quotation omitted).

¶ 25. The court here found that, when Sequoya answered the door, the officer asked if he could come in and talk to her and "[s]he said he could." The court further found that

> [u]pon stepping over the threshold, the officer began to tell [Sequoya] about the marijuana and cash found on her brother. From his location he could observe a marijuana roach on a dresser in the living room. He asked [Sequoya] if he could search the home based on the presence of marijuana. After the defendant said she wasn't sure, [the officer] said he would seize the residence and apply for a search warrant.

> [Sequoya] decided to consent to the search. She knew that a search warrant might take hours to obtain and she didn't want her young son to have to stay at another residence while waiting for the warrant.

Sequoya signed a consent-to-search form, indicating that she had freely given permission to search the house and that no threats or promises had forced her consent.

¶ 26. Although she did not argue below that her consent to the entry was involuntary, Sequoya asserts on appeal that this Court should adopt a special standard, requiring the police to expressly inform a resident of his or her right to refuse consent as a precondition to a residential search in these circumstances. Sequoya relies in this regard on *State v. Ferrier*, 960 P.2d 927 (Wash. 1998), a ruling in which the Washington Supreme Court criticized the so-called "knock and talk" procedure whereby the police ask a resident if they may enter a residence to talk about a matter and once inside seek permission to search. The Washington court found this common technique to be "inherently coercive to some degree," *id.* at 933, and held "that when police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant, they must, prior to entering the home, inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can

revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home." *Id.* at 934.

¶ 27. Whatever the merits of the *Ferrier* decision, we need not address its application on the facts presented here.[3] First, the argument was not raised below, and therefore need not be addressed on appeal absent a showing of plain error. *State v. Lee*, 2008 VT 128, ¶ 11, 185 Vt. 110, 967 A.2d 1161 (we review arguments not raised initially in the trial court solely for plain error amounting to a miscarriage of justice). Second, even considered on its merits the *Ferrier* decision is inapposite. The Washington court was careful to limit its holding to circumstances where, as the evidence there showed, the police conducted the knock and talk for the express "purpose of obtaining consent to search a home." *Ferrier*, 960 P.2d at 934. Indeed, in a later decision the same court held that a "*Ferrier* warning" before entry is not required when the police seek merely to speak to a resident in the course of a criminal investigation and not "for the purpose of obtaining consent to a warrantless search." *State v. Khounvichai*, 69 P.3d 862, 867 (Wash. 2003). Here the officers' stated intentions were to confirm Yosef's identity and continue their investigation into drug dealing. Sequoya does not claim, nor does the record show, that the police sought entry for the purpose of conducting a warrantless search. Indeed, the undisputed evidence reveals that the search request occurred only after the officers entered and observed marijuana in plain view. Accordingly, we find no grounds to require a pre-entry warning.

¶ 28. Nor do we discern any basis to disturb the trial court's finding that Sequoya's consent to the subsequent search of her house was voluntary. Sequoya claims that her consent was

---

[3] We note, however, that many other jurisdictions have rejected the assertion that the knock-and-talk approach is inherently coercive or compels a special warning on the right to refuse consent. See, e.g., *United States v. Chambers*, 395 F.3d 563, 567 n.2 (6th Cir. 2005) ("Courts generally have upheld [the knock-and-talk] investigative procedure as a legitimate effort to obtain a suspect's consent to search."); *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."); *Perkins v. Commonwealth*, 237 S.W.3d 215, 219 (Ky. Ct. App. 2007) ("Many courts . . . have recognized the legitimacy of knock-and-talk encounters at the home of a suspect or another person who is believed to possess information about an investigation.").

coerced by police statements indicating that they would effectively "seize" the house for several hours if required to spend time applying for a warrant. In this regard Sequoya testified, and the court found, that she was concerned her eight-year-old son would arrive while the police were applying for the warrant and that he would be forced be go elsewhere. She also testified that she consented to the search because she "was scared," but added that she "thought it was the right thing to do" and that if she withheld consent the police would "lock down the house" and her son would be "out in the cold."

¶ 29. The record here contains no evidence that the police coerced Sequoya's consent to search through the use of physical force, threats, or intimidation. Nor did Sequoya's concern that withholding consent might inconvenience her son amount to the sort of psychological pressure that courts view as impermissibly coercive. Cf. *United States v. Ivy*, 165 F.3d 397, 404 (6th Cir. 1998) (defendant's consent to search of home held to be involuntary where police handcuffed his girlfriend to a chair for an hour and a half and periodically removed their baby threatening to place it in protective custody unless he consented); *People v. Haydel*, 524 P.2d 866, 871 (Cal. 1974) (consent held to be product of "psychological coercion and involuntary" where it was induced by police promises to release wife and son from custody).

¶ 30. Of more concern is whether the officers' statements that they would apply for a warrant if Sequoya withheld consent rendered the consent involuntary by implying that any refusal would be futile.[4] A substantial number of cases and commentators have considered this issue. One leading authority has summarized the law by observing that consents given in response to police statements indicating an intent "to seek a warrant have been upheld as voluntary" while threats "to *obtain*" a warrant may present a closer question, particularly where legal grounds for the warrant are lacking. 4 W. LaFave, Search & Seizure § 8.2(c), at 70, 72 (4th ed. 2004). The former may be said to describe what will occur in the event of a refusal, while the latter may be an overstatement of authority "by suggesting that a search is inevitable and that the withholding of consent will be futile." *Commonwealth v. Mack*, 796 A.2d 967, 973 (Pa. 2002) (Saylor, J.,

---

[4] Although Sequoya did not develop this point at any length below, she did claim that the officer's threat to obtain a warrant rendered her consent involuntary.

concurring); see also *United States v. Larson*, 978 F.2d 1021, 1024 (8th Cir. 1992) (collecting cases holding that consent is not coerced where police indicate that they would attempt to obtain a warrant if defendant refused consent); *United States v. Garcia*, 890 F.2d 355, 361-62 (11th Cir. 1989) (police statement that if defendant refused consent they "would have to secure the house and apply for a search warrant" held not to be coercive); *Dotson v. Somers*, 402 A.2d 790, 794 (Conn. 1978) ("the intimation that a warrant will automatically issue is as inherently coercive as the announcement of an invalid warrant"); *Daniel v. State*, 582 N.E.2d 364, 369 (Ind. 1991) (consent to fingerprinting not vitiated where police advised defendant that a search warrant "would be sought" in the event of a refusal); *State v. Patch*, 702 A.2d 1278, 1282 (N.H. 1997) (police statement that they would apply for a warrant if defendant refused consent was merely "[i]nforming the defendant of viable alternatives" and did not render consent involuntary).

■ ¶ 31. The officer here testified that he told Sequoya that he thought he had probable cause "to seize the residence and apply for a search warrant," and the court so found. Thus the officer did not communicate that a warrant would automatically issue regardless of Sequoya's decision or that her refusal would be a futile gesture; rather, he indicated truthfully and accurately that a refusal would result in an application for a search warrant involving the submission of an affidavit. Accordingly, in conformity with the weight of authority, and absent other evidence of coercion, we discern no ground to reverse the court's conclusion that the consent to search was voluntary, and therefore no basis to disturb the judgment of conviction of Sequoya.[5]

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with the views expressed herein.*

---

[5] We note that Sequoya's testimony differed from the officer's, as she recalled that the officer stated "he would *get* a warrant" if she refused consent. (Emphasis added.) The trial court, however, was entitled to credit the officer's version, and there is no argument or showing here that the finding was clearly erroneous. See *State v. Dixon*, 2008 VT 112, ¶ 34, 185 Vt. 92, 967 A.2d 1114 (it is the trial court's province to weigh the evidence and we will not reevaluate conflicting testimony or witness credibility). We note, as well, that numerous courts, including our own, have upheld consensual searches under similar circumstances where an officer's statement that he would get or obtain a warrant is supported by probable cause. See *State v. Sole*, 2009 VT 24, ¶ 30, 185 Vt. 504, 974 A.2d 587 (assuming that police officer told the defendant that a warrant was likely or sure to issue, there was no

¶ 32. **Johnson, J.,** concurring and dissenting. I concur with the majority's holding that Yosef was unlawfully detained and searched, but I would hold further that police exploited that unlawful detention and search to gain entry to Sequoya's home and obtain evidence connected to the prior search. I find no legal rationale to support excluding evidence taken from an unlawful search of the targeted drug dealer, but then admitting related evidence obtained from the home of the suspect's sister in a follow-up investigation mere minutes after the unlawful search. Under the applicable law, that latter evidence is plainly tainted by the unlawful search and therefore not admissible. Even if Sequoya's consent could be considered voluntary under ordinary circumstances, it was insufficient to purge the taint resulting from the previous unlawful search that led police to her home. Accordingly, I would reverse both convictions.

¶ 33. As an initial matter, before addressing Sequoya's claim that the evidence seized from her residence was tainted by the prior unlawful search of Yosef, I see no merit to the State's contention that Sequoya lacks standing to make this claim. Assuming that Sequoya requires independent standing to rely upon an illegality already found by this Court in the companion case against Yosef, her standing under the circumstances of this case is apparent. To establish standing for the assertion of an Article 11 violation committed against another person, "a defendant need only assert a possessory, proprietary or participatory

coercion where his belief was well founded); accord *State v. Ballou,* 186 P.3d 696, 704 (Idaho Ct. App. 2008) ("Many jurisdictions have concluded that, if officers have probable cause to obtain a warrant, telling a suspect that they will obtain a warrant if consent is refused does not vitiate the suspect's consent to search."); accord *United States v. Marshall,* 348 F.3d 281, 286 (1st Cir. 2003); *United States v. Meza-Corrales,* 183 F.3d 1116, 1125 (9th Cir. 1999); *United States v. Salvo,* 133 F.3d 943, 954 (6th Cir. 1998); *State v. Owens,* 418 N.W.2d 340, 344 (Iowa 1988); see generally 4 W. LaFave, *supra,* § 8.2(c) at 72, 73-74 (noting that a threat to obtain a warrant "is often said . . . not [to be] per se coercive" and is "likely not to affect the validity of the consent if the police then had probable cause upon which a warrant could issue."). Here, apart from any other information the officers' had obtained earlier, their plain-view observation of the marijuana in Sequoya's hall was sufficient to establish probable cause for a search warrant. See *State v. Melchior,* 172 Vt. 248, 252-53, 775 A.2d 901, 905 (2001) (officer's affidavit that, based upon his training and experience, he observed what appeared to be marijuana in field was sufficient to support finding of probable cause to believe that a crime had been committed and that evidence of the crime would be found in the place to be searched).

interest in the item seized or the area searched." *State v. Wood*, 148 Vt. 479, 489, 536 A.2d 902, 908 (1987). This is a broader standard than the "expectation of privacy" test employed by the federal courts under the Fourth Amendment. As we explained in *State v. Welch*, 160 Vt. 70, 77, 624 A.2d 1105, 1109 (1992), "we look at the objective relationship of the person to the place searched or items seized, as opposed to a subjective evaluation of the legitimacy of the person's expectation of privacy."

¶ 34. In support of her standing claim, Sequoya asserts not only a possessory interest, but also a participatory interest, which we defined in *Welch* as " 'connot[ing] some involvement in the underlying criminal conduct' that generated the seized evidence." *Id.* (quoting *State v. Mollica*, 554 A.2d 1315, 1321 (N.J. 1989)). Sequoya's alleged "involvement in the underlying criminal conduct that generated the evidence" is not difficult to discern from the record. The investigating officer readily acknowledged his suspicion that the cash and · drugs seized from Yosef represented evidence of "some kind of drug operation" potentially involving Sequoya, with whom Yosef was staying. Indeed, immediately following the illegal detention and search of Yosef, the officer approached Sequoya's home to further his investigation of drug dealing and confirm his suspicions that had been further aroused by the evidence taken from Yosef. As it turned out, based on the discovery of drugs and other contraband subsequently seized from the house, which were linked to the evidence seized from Yosef minutes earlier, the investigating officer alleged in his affidavit of probable cause that "Miss Pitts . . . and [Y]osef Pitts are conspiring to transport large quantities of cocaine to Vermont for sale." The record thus amply supports Sequoya's claim to participatory standing to assert the illegal detention of Yosef as a basis to suppress all of the evidence that flowed therefrom.

¶ 35. Indeed, the State does not even contest that Sequoya has participatory standing, but rather argues only that she failed to claim participatory standing before the district court. This argument is unavailing. Sequoya explicitly claimed standing, citing the applicable test set forth in *Wood* and noted above. Although she did not specify why in this case she had participatory, as opposed to possessory, standing, the State did not contest her standing on any basis, and the district court ruled only that she did not have possessory standing. Under these circumstances, we should consider the argument properly preserved; but even if we did not, it

would be plain error not to recognize her obvious participatory standing. See *State v. Mayo*, 2008 VT 2, ¶ 9, 183 Vt. 113, 945 A.2d 846 (stating test for finding plain error).

¶ 36. Regarding the merits of Sequoya's taint argument, the majority concludes that (1) the record does not establish a causal nexus between Yosef's illegal detention and the seizure of evidence from Sequoya's home; and (2) the record supports the trial court's finding that Sequoya voluntarily consented to the search of her home. In reaching these conclusions, the majority considers whether Sequoya voluntarily consented to police entering and searching her home as if her consent were completely independent of the prior illegal detention and search of her brother. That is inconsistent with the applicable standard of review:

> Although, to be sure, evidence obtained by means of a valid consent following an illegal detention may in some circumstances be admissible where the causal nexus with the original illegality is sufficiently attenuated, the voluntary nature of any consent that follows must necessarily be established by the State *with clear and positive evidence*.

*State v. Sprague*, 2003 VT 20, ¶ 31, 175 Vt. 123, 824 A.2d 539 (emphasis added; citation omitted); see *United States v. Sanchez-Jaramillo*, 637 F.2d 1094, 1099 (7th Cir. 1980) ("The government bears a heavy burden of demonstrating that consent given subsequent to an illegal detention was properly obtained."); *State v. Arroyo*, 796 P.2d 684, 687-88 (Utah 1990) ("When the prosecution attempts to prove voluntary consent after an illegal police action . . . the prosecution has a much heavier burden to satisfy than when proving consent to search which does not follow police misconduct." (quotation omitted)).

¶ 37. Neither the trial court nor the majority have examined Sequoya's consent under this more onerous standard in light of the prior illegal activity. Cf. *Sprague*, 2003 VT 20, ¶ 31 n.2 (concluding that defendant's multiple consents to search following illegal police conduct were tainted and ineffective, and noting that trial court found consents to be voluntary without considering them "in the context of the immediately preceding illegal seizure"). Examined in light of the proper standard, the record reveals that the State has failed to meet its heavy burden of demonstrating by clear and positive evidence that police obtained

from Sequoya's home, via her consent, evidence that was not tainted by the unlawful detention of Yosef immediately preceding the search of her home.

¶ 38. The leading commentator on search and seizure law has noted that, when confronted with the question of whether to admit physical evidence obtained by a purported consent following some form of illegal police activity, some courts have focused on the voluntariness of the consent, while others have sought to determine if the evidence was tainted by the prior illegality. 4 W. LaFave, Search & Seizure § 8.2(d), at 76 (4th ed. 2004). Professor LaFave has emphasized that the issues are not identical and that evidence obtained by a purported consent following illegal police activity "should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality." *Id.* Thus, while consent certainly could be deemed involuntary due to the taint of prior unlawful police conduct and other relevant circumstances, the consent need not be involuntary for the taint from the prior unlawful conduct to be sufficient to require suppression of evidence obtained as the result of that consent. *Id.* at 76-77; see *Brown v. Illinois,* 422 U.S. 590, 601-02 (1975) (rejecting notion that confession obtained after illegal arrest is untainted merely because it was voluntary in Fifth Amendment sense); *United States v. Furrow,* 229 F.3d 805, 813 (9th Cir. 2000) ("The mere fact of voluntariness does not mean that a consent is not tainted by a prior Fourth Amendment violation."). The latter situation may occur "when the pressure upon the person from the prior illegality is not so great that his will has been overborne . . . , but yet it cannot be said . . . that his consent was sufficiently an act of free will to purge the primary taint." 4 LaFave, *supra,* at 77-78 (quotation omitted). The ultimate question is whether the challenged evidence was obtained by exploitation of previous unlawful police conduct or by means sufficiently distinguishable so as to purge the primary taint of the prior illegality. *Id.* at 76; see *State v. Phillips,* 140 Vt. 210, 218, 436 A.2d 746, 751 (1981) (courts must determine whether challenged evidence resulted from exploitation of prior illegality or rather from " 'means sufficiently distinguishable to be purged of the primary taint.' " (quoting *Wong Sun v. United States,* 371 U.S. 471, 488 (1963))).

¶ 39. Several factors come into play in making this determination in the context of a consent to search following unlawful police conduct. Chief among them are (1) the temporal proximity of the

illegal detention in relation to the consent, and (2) the presence of any intervening circumstances occurring between the illegal activity and the consent sufficient to erase the taint from the illegal activity. See *Sprague*, 2003 VT 20, ¶ 31; see also *United States v. Hernandez*, 279 F.3d 302, 308-09 (5th Cir. 2002) (citing as factors temporal proximity, intervening circumstances, and whether police conduct was flagrant); 4 LaFave, *supra*, at 82-84 (noting factors that United States Supreme Court has cited in determining whether consent is tainted by prior police illegality: proximity of consent to illegal conduct; whether illegal conduct resulted in police observation of object to which consent to search was obtained; whether illegal conduct was flagrant; whether consent was volunteered or requested; whether person consenting was aware of right to refuse to consent to search; whether significant intervening events occurred; and whether purpose underlying illegality was to obtain consent to search).

¶ 40. Each of these factors militate in favor of Sequoya in this case, precluding the State from meeting its heavy burden of demonstrating that its prior illegal activity did not taint its subsequent search of Sequoya's home. This is not a situation, as in *Phillips*, 140 Vt. at 219, 436 A.2d at 751, where the police obtained the challenged evidence through a search "made with probable cause, based on information received totally independently of" the claimed illegality. To the contrary, the record reveals, as acknowledged by the trial court and the majority, that the investigating officer approached Sequoya's home immediately following his unlawful investigatory detention and search of Yosef, during which he discovered evidence that further aroused his suspicions of drug activity at Sequoya's home. The officer testified at trial that he approached Sequoya's home to verify information that Yosef had provided during the illegal detention and to "continue investigating whether this was some kind of illegal drug operation." It could not be more plain that the illegal detention and search of Yosef, and the resulting recovery of drugs and cash on his person, led police to approach Sequoya's residence and make further investigatory inquiries based on aroused suspicions of a drug operation at the house. See 4 LaFave, *supra*, at 88 ("If . . . the prior illegal search provides a significant lead in terms of indicating what other evidence [police] ought to seek or where they ought to seek it, or if the illegal search provided the means of gaining access to the person from whom the consent was

obtained, then a consent obtained by exploitation of that information would constitute a fruit of the earlier illegal search.").

¶ 41. The majority attempts to deny the apparent connection between the illegal police conduct and the search of Sequoya's home by pointing to a single line of testimony by the investigating officer, who initially agreed that he would not have had any reason to go to Sequoya's home if he had not talked to Yosef, but then appeared to qualify that response by stating: "Well, other than the cab driver telling me." This single statement is not "ample" information demonstrating an independent basis for police to approach and search Sequoya's home, as the majority states, *ante*, ¶ 21, and hardly satisfies the State's heavy burden of showing, by clear and positive evidence, the absence of taint following the illegal police conduct. On the whole, the record does not support speculation that the police would have approached Sequoya's house to confirm Yosef's identification or further investigate drug dealing based solely on the cab dispatcher's statement, absent the statements made by Yosef and the evidence seized from him following his unlawful detention. This is borne out by the fact that, upon arriving at the house, the officer immediately told Sequoya that he had her brother outside and had found drugs and a significant amount of money on him. In any event, it is undisputed that the police approached Sequoya's house immediately following the unlawful detention and search of Yosef; thus, the temporal proximity factor must be weighed in favor of Sequoya.

¶ 42. Nor can the State reasonably claim that there were any intervening factors that purged the taint. While the investigating officer noticed what he believed to be a marijuana roach in plain view once he crossed the threshold of the house, the evidence is equivocal at best from the State's perspective — certainly not clear and positive — as to what the officer said before Sequoya consented to his entry into her home. On this point, the officer testified, "I asked her if I could come in and talk to her. She said yes. And I told her what it was about. You know, that Yosef was coming up there, and he had a large amount of money and marijuana." Later, however, on cross-examination, the officer testified that when he asked Sequoya if he could come in, she asked "what was it about. I told her it was about Yosef." According to the officer, he told Sequoya that Yosef "had a little weed on him, and he was coming upstairs."

¶ 43. While not absolutely clear, the record thus fairly indicates that, before seeking entry, the officer informed Sequoya that he was there because of the money and drugs seized from Yosef. This interpretation of the officer's testimony is further supported by Sequoya's testimony, who recalled that, when she came to the door, the officer informed her that "he had [her] brother downstairs," that she then asked him " 'For what? What happened?' And he said, um, 'He had weed on him, and a large amount of money.' " The officer then asked her for identification, she found a learner's permit to show him, and "that's when he asked if he could come in, maybe." She explained that she acquiesced to his request because she was afraid that her brother was going to jail. Although the trial court's findings suggest, without explicitly stating, that the officer stepped "across the threshold" before explaining the reasons for his visit, the record does not support this sequence of events.

¶ 44. But even if it did, the State failed to meet its heavy burden of demonstrating that the extension of the police investigation to Sequoya's home and the subsequent discovery of drugs there did not result from exploitation of the immediately preceding unlawful detention and search of Yosef. The record plainly reveals that the police gained entry to Sequoya's home largely through exploitation of the original illegality — by using the fruits of the illegal detention and search of Yosef as leverage to obtain Sequoya's acquiescence in the officer's request. Cf. *Hernandez*, 279 F.3d at 308-09 (concluding that although defendant voluntarily consented to having police search her suitcase, the consent and ensuing search resulted from exploitation of prior unlawful police conduct related by temporal proximity and unbroken by intervening events); *United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000) (concluding that sister's consent for police to search her home immediately following her brother's illegal arrest was voluntary but tainted by illegal police conduct). In short, absent the drugs and money recovered illegally from Yosef, it is difficult to imagine that the police would have sought permission to enter the house so persistently, or that consent would have been obtained so readily.

¶ 45. Given the record before us, there is some doubt about the voluntariness of Sequoya's consent to search her home. The investigating officer testified that he told Sequoya he had probable cause to obtain a search warrant and seize her apartment in the

interim. In his affidavit of probable cause, he stated: "I told her that [seeing the roach] gives me probable cause to believe that there may be more drugs here. We have a problem with people from NY bringing large amounts of drugs here." He further averred as follows:

> I continued explaining to her that I believed that I had probable cause to seize the apartment. She could consent to a search or request that I write an affidavit for a search warrant. If you chose that route it does not mean that I am going to leave you alone here for two hour[s] while I go write an affidavit. . . . I asked her how she wants to do this.

Sequoya testified that she consented to the search because her son was coming home soon and she did not want him to witness the search and be locked out of his home.

¶ 46. These facts make the voluntariness of Sequoya's consent at least questionable, but even assuming that the trial court correctly ruled that there was no coercion and that the consent was voluntary, surely the State has failed to demonstrate an absence of taint resulting from the prior illegal search. For these reasons, I would conclude that the evidence seized from the house was illegally obtained and should have been suppressed.

¶ 47. I am authorized to state that Justice Skoglund joins this dissent.